60 F.3d 825
NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Emmanuel DAVIS, Defendant-Appellant.
 No. 94-5105.
 United States Court of Appeals, Fourth Circuit.
 Argued: June 7, 1995
Decided: July 5, 1995
 
 James Christopher Savage, Rockville, MD, for Appellant.
 Richard Charles Kay, Asst. U.S. Atty., Baltimore, MD, for Appellee.
 Lynne A. Battaglia, U.S. Atty., Baltimore, MD, for Appellee.
 Before WILKINSON, HAMILTON, and MICHAEL, C.J.
 OPINION
 PER CURIAM:
 
 
 1
 Emmanuel Davis was charged for using and conspiring to use unauthorized access devices (credit cards) in violation of 18 U.S.C. Sec. 1029. A jury convicted him on both counts. Davis appeals his convictions. Finding no error, we affirm.
 
 I.
 
 2
 On April 5, 1993, Special Agents Cole and Murray of the United States Immigration and Naturalization Service (INS) went to the Silver Spring, Maryland, apartment of Lawrence Afolabi to arrest him as an out-of-status alien. The INS agents were accompanied by Leland Baughman, a police officer from Montgomery County, Maryland. Murray knocked on the apartment door and announced that he was with the INS. Afolabi opened the door, and the officials identified themselves. Murray asked Afolabi if they could come in to speak with him. Afolabi stepped back, opened the door, and allowed the officials to enter.
 
 
 3
 As the officials stood in the entry area, Murray asked Afolabi if he had identification and immigration papers. Afolabi responded that his identification was in another room, and he agreed to get the papers. As Afolabi walked toward the bedroom, Murray said he was going to follow him. Afolabi gave no response to this statement and continued walking. Murray, Cole and Baughman walked after him.
 
 
 4
 The apartment was a small one-bedroom unit with a short, narrow entry way leading from the front door, past a kitchen area, to a combined living room/dining room. A door by the living room/dining area led into the bedroom. Murray and Cole followed Afolabi all the way to the bedroom. In the bedroom Afolabi produced a green card, and the agents placed him under administrative arrest for an immigration violation.
 
 
 5
 Meanwhile, while the agents and Afolabi were in the bedroom, Baughman had walked into the living room/dining area, where he saw on a table several items of mail that were addressed neither to Afolabi nor his address. The mail was in plain view, and Baughman could read the names and addresses without touching the envelopes. Baughman suspected that Afolabi might be involved in mail theft and the illegal use of stolen credit cards. Baughman also saw on another table some rolling papers and what he believed to be marijuana residue in an ashtray.
 
 
 6
 As the INS agents led Afolabi from the bedroom back through the living room/dining area, Baughman confronted Afolabi about what he had found and asked if he could search the apartment. Afolabi responded "go ahead and look around." Baughman looked around and saw other items of mail that were not addressed to Afolabi, as well as bank statements and credit cards that were not in Afolabi's name. Baughman called one of the addressees that appeared on one of the items of mail, and she said she had not authorized anyone to take her mail. Baughman then placed Afolabi under arrest for mail theft.
 
 
 7
 As the officials were leaving the apartment with Afolabi, appellant Emmanuel Davis drove up in a Mercedes Benz. The INS agents asked Davis for his green card. Davis was belligerent and refused to cooperate. The agents placed him in custody for an alleged immigration violation.
 
 
 8
 Based on what he had seen in the apartment, Officer Baughman filled out an application for a warrant to search the apartment. Upon executing the warrant, he seized many incriminating documents. These included stolen credit cards, checkbooks and handwritten notes with other people's names, addresses, telephone numbers, social security numbers, credit card numbers and mothers' maiden names.
 
 
 9
 On May 6, 1993, Davis and Afolabi were named in a three-count federal indictment. Count One charged them with conspiring to use unauthorized access devices in violation of 18 U.S.C. Sec. 1029(b)(2). Counts Two and Three were substantive counts charging Davis and Afolabi, respectively, with the use of an unauthorized access device in violation of 18 U.S.C. Sec. 1029(a)(2) and 18 U.S.C. Sec. 2.
 
 
 10
 Before the jury was selected, defendants filed a motion to suppress evidence recovered from the apartment. The court held a hearing and denied the motion. After the jury was selected and sworn but before any testimony was offered, Afolabi pled guilty to the conspiracy count and his substantive count. The case against Davis proceeded to trial on September 1-2, 1993. The jury returned guilty verdicts on both the conspiracy count and the substantive count. The court sentenced Davis to 33 months on each count, both terms to run concurrently. Davis appeals his convictions.
 
 II.
 
 11
 Davis first challenges the district court's denial of his motion to suppress physical evidence recovered from the apartment. The government conceded at trial that Davis has standing to challenge the search of the apartment.
 
 
 12
 If a warrantless search is conducted pursuant to lawfully obtained consent, then the search is reasonable and does not violate the Fourth Amendment. United States v. Hummer, 916 F.2d 186, 189 (4th Cir.1990), cert. denied, 499 U.S. 970 (1991)." The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). The issue here is whether it was objectively reasonable for an officer in Baughman's position to have understood that Afolabi consented to his being in the living room/dining area, where the mail and marijuana ashes were in plain view.
 
 
 13
 Davis argues that, although Afolabi may have impliedly consented to Agent Murray's following him to the bedroom (passing through the living room/dining area on the way), that consent did not extend to Officer Baughman, who should have remained in the entry way. And because Baughman did not have permission to be in the living room/dining area, says Davis, all subsequent searches, too, were illegal, for they were based on Baughman's initial observations there.
 
 
 14
 In determining whether consent was voluntarily given, the district court must look to the totality of the circumstances. Hummer, 916 F.2d at 189. In its memorandum opinion on the motion to suppress, the district court made the following findings of fact: Afolabi consented to the officers entering his apartment and to them following him to his bedroom; the living room/dining area was on the route from the front door to the bedroom; the mail and ashtray seen by Baughman in the living room/dining room were in plain view; when confronted with the ashtray, Afolabi gave his consent for the officers to "look around"; when Baughman looked around he found other items that formed the basis for the search warrant application. The court concluded that Afolabi willingly consented to the search of his apartment and that the officers acted at all times within the scope of his consent.
 
 
 15
 The district court's determination that Afolabi voluntarily consented to Officer Baughman's entry into the living room/dining area is a finding of fact, and we must uphold that finding unless it is clearly erroneous. Id. We conclude that the district court's finding here was supported by the record and is not clearly erroneous. Afolabi let the officials into the apartment, walked into the living room/dining area, continued into the bedroom, and did not object as the officials followed him. A reasonable person would have believed that Afolabi consented to all the officials' passing through the living room/dining area (where the items were in plain view). See United States v. Mejia, 953 F.2d 461 (9th Cir.1991), cert. denied, 504 U.S. 926 (1992).
 
 III.
 
 16
 Davis challenges the sufficiency of the evidence on both the conspiracy count and the substantive count. When reviewing a sufficiency claim, we view the evidence in the light most favorable to the government. The verdict must stand if there is substantial evidence to support it. Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 A.
 
 17
 With respect to the conspiracy count, the evidence seized from the Afolabi apartment clearly showed that Afolabi was involved with the use of unauthorized access devices. Davis argues that Afolabi could have acted on his own and that the evidence was insufficient to show that there was a conspiratorial agreement between the two of them.
 
 
 18
 The following evidence was offered in support of the conspiracy charge. First, there was evidence to link Davis to the apartment where the evidence was recovered. The apartment manager testified that she considered both Davis and Afolabi to be residents there, though Afolabi was the only one listed on the lease. She based her testimony on the following: Davis was continuously present there, the visitors' log indicated that visitors of the apartment named Davis as the resident, and Davis parked in the resident parking area.[1]
 
 
 19
 Second, the police seized from the apartment a blue bag. Inside the blue bag were various documents. Some documents bore Davis's fingerprints and some bore Afolabi's prints. One of the documents with Afolabi's fingerprints had numerous names and credit card numbers. In addition, the bag contained an envelope addressed to Davis and impressed with Davis's fingerprints. Inside this envelope were some documents with credit card numbers belonging to other people. The envelope contained one document (without Davis's fingerprint) with a credit card number belonging to Mrs. Wood; Mrs. Wood's credit card was illegally accessed at a time when Afolabi was out of the country and Davis was staying at the apartment. Another document in the envelope bore Davis's fingerprint and had the following notations: the name "Arthur L. Harris," a Maryland address, and what looked to be a social security number and a credit card number.[2] Third, photos were taken at an automatic teller machine (ATM) during the fraudulent use of five credit cards. (The photos indicate the date, time, and credit card being used.) There was a connection between one of these cards and some documents found in the apartment. The ATM photos show an obstructed profile view (mid-nose to beneath the lower lip) of the driver's face. The jury could compare the photos to Davis, who was in the courtroom.
 
 
 20
 Davis attacks each piece of evidence as insufficient by itself to show a conspiratorial agreement. But viewed as a whole and in the light most favorable to the government, the evidence was substantial, and therefore we must affirm his conviction. To be sure, Afolabi may have been the main player in the conspiracy, but "a defendant may be convicted despite having played only a minor role in the overall conspiracy," United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.), cert. denied, 112 S.Ct. 3051 (1992).
 
 B.
 
 21
 Count Two of the indictment charged that Davis used or aided and abetted the use of a NationsBank credit card bearing the name "Stephen Cades," in violation of 18 U.S.C. Sec. 1029(a)(2) and 18 U.S.C. Sec. 2. The government never recovered the Cades card, and it offered no proof that Davis actually used the Cades card himself. Rather, the key evidence here was that one of the documents recovered from the apartment and bearing Afolabi's fingerprint had information (account number and personal identification number) relating to the Cades account. This document was in the blue bag that contained the aforementioned documents addressed to Davis and impressed with Davis's fingerprints.
 
 
 22
 The government argues that the conviction should be sustained for two reasons. First, the government says there was substantial evidence to show that Davis aided or abetted Afolabi's use of the Cades card. Second, the government says there was substantial evidence to show that the Cades card was used in furtherance of the conspiracy charged in Count One. See Pinkerton v. United States, 328 U.S. 640, 647-48 (1946) (a member of a continuing conspiracy may be convicted for foreseeable substantive offenses committed by a coconspirator in furtherance of the conspiracy); United States v. Chorman, 910 F.2d 102, 110-11 (4th Cir.1990).[3]
 
 
 23
 We need not decide whether the evidence was sufficient to support an aiding and abetting theory, because a rational juror could have inferred beyond a reasonable doubt that the Cades card was used by Afolabi in furtherance of the conspiracy charged in Count One. Therefore, Davis could be convicted on the substantive count. See United States v. McManus, 23 F.3d 878, 883 (4th Cir.1994) (defendant indicted as aider and abettor may be convicted under the Pinkerton doctrine); United States v. Cerone, 830 F.2d 938, 945 (8th Cir.), cert. denied, 486 U.S. 1006 (1987).
 
 IV.
 
 24
 Davis's last challenge goes to the district court's refusal to give a multiple conspiracy instruction. We review for abuse of discretion. United States v. Russell, 971 F.2d 1098, 1107 (4th Cir.1992), cert. denied, 113 S.Ct. 1013 (1993).
 
 
 25
 Count One of the indictment charged a conspiracy to "use" unauthorized access devices. Davis requested a multiple conspiracy instruction on the ground that the jury might convict him for trafficking, as opposed to using, unauthorized access devices. But the evidence at trial simply did not support the theory that Davis and Afolabi trafficked in access devices, and therefore the district court did not abuse its discretion in refusing to give a multiple conspiracy instruction on the basis of that theory. See United States v. Crockett, 813 F.2d 1310, 1316 (4th Cir.) ("If the facts support only a single conspiracy, the jury need not be instructed about multiple conspiracies."), cert. denied, 484 U.S. 834 (1987).
 
 
 26
 As a separate matter, Davis contends that the district court abused its discretion in refusing to give a multiple conspiracy instruction based on a "separate group" theory. He says the evidence at trial showed a separate, uncharged conspiracy involving him and others unindicted, but not him and Afolabi. The short answer is that Davis never asked the district court for such an instruction.
 
 
 27
 Davis made clear to the district court that he was seeking a multiple conspiracy instruction, not on the basis of a separate group theory, but rather out of a concern that the jury might convict him for trafficking, instead of using, unauthorized access devices. Davis explained to the court:
 
 
 28
 So I suppose that ... something has been proven, but ... whether, in fact, it was a conspiracy to use access devices is in question. It could very well be a conspiracy to traffic in information, or any other things that would be related to it. I suppose that is a multiple conspiracy instruction. (JA 471)
 
 
 29
 The government responded that he was not entitled to a multiple conspiracy instruction, because the evidence did not show that there were separate conspiracies involving different groups of people. Davis, referring to the multiple conspiracy instruction set out in 1 L. Sand, Modern Federal Jury Instructions (Instruction 19-5), conceded in response that an instruction based on "several independent conspiracies with various groups or members" was not applicable. JA 473. Davis went on to say:
 
 
 30
 I would only indicate to the Court on that instruction in Sands, I would not ask the Court to address the language that deals with the existence of another group of people, another group of co-conspirators, but simply that the object of the conspiracy [i.e., use versus trafficking] ... is likely to be at least questionable or uncertain. (JA 475) The record makes clear that Davis did not request a multiple conspiracy instruction based on a "separate group" theory, and the district court did not abuse its discretion in failing to give one. See United States v. Hicks, 748 F.2d 854, 857 (4th Cir.1984) ("at least upon proper request, a defendant is entitled to an instruction ... for which there is a foundation in the evidence" (emphasis added)).
 
 V.
 
 31
 We affirm Davis's convictions on both counts.
 
 AFFIRMED
 
 
 [1]
 We note that in the section of his motion to suppress in which he discussed his standing to challenge Officer Baughman's search of the apartment, Davis said: "It is believed that there is sufficient evidence to establish that Mr. Davis was a resident of apartment 604 and had a legitimate expectation of privacy in the apartment." JA 20
 
 
 [2]
 Davis points out that the government offered no evidence to show that Mr. Harris was a real person or that the notations on the paper related to a credit card account. But surely the jury could have drawn inferences from this document. It contained a nine-digit number with the middle two digits separated by hyphens on each side, like a social security number. And it contained a sixteen-digit number with spaces after every four digits. The first six of these sixteen digits were "4337 00." One of the government's witnesses (Delores Boni, a Senior Fraud Investigator with NationsBank) testified that the first six digits of a credit card number identify the credit card issuer, that NationsBank credit cards begin with "4337 00", and that NationsBank credit card numbers are sixteen digits long, with spaces after every four digits. And the jury had before it the other documents from the blue bag (bearing Afolabi's fingerprints) that also contained names, social security numbers, and credit card numbers, some of which also began with "4337 00." From all of this the jury could have rationally inferred that the "Harris document" was part of the scheme to defraud
 
 
 [3]
 The jury instructions are not in the joint appendix. But the government represents that it requested and the district court gave a Pinkerton instruction. Davis does not contend otherwise