**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0697n.06
Filed: September 26, 2006

**05-5645**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| CARLOS ORLANDO BEASLEY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: KENNEDY and DAUGHTREY, Circuit Judges, and ADAMS,[*] District Judge.

PER CURIAM. The defendant, Carlos Orlando Beasley, was sentenced to 180 months in prison upon entry of a conditional guilty plea to charges of possession with intent to distribute five grams or more of cocaine base, being a felon in possession of a firearm, and possessing firearms in furtherance of a drug trafficking crime. In the district court, Beasley specifically reserved the right to appeal the adverse ruling on his motion to suppress the evidence seized from the motel room registered to him. On appeal, he now challenges not only that determination, but also the validity of Count 3 of the indictment charging him with possession of firearms in furtherance of a drug trafficking crime. Finding

---

[*]The Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

no merit to Beasley's allegations of error, we affirm the judgment entered against the defendant but remand for correction of a clerical error in the judgment order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The record in this case indicates that while Kenton County Police Department officers Brett Benton and Andy Muse were on routine patrol in the parking lot of the Covington Extended Stay America hotel with their four-legged K-9 partner, Tommy, the dog alerted on the driver's door of a red 2002 Pontiac Grand Am, indicating that he detected the odor of narcotics emanating from that portion of the vehicle. As Benton and Muse attempted to ascertain who owned or drove the Grand Am, the defendant walked toward the car from the hotel with car keys in his hand. After talking with the officers, Beasley provided them with his Ohio driver's license which listed his home address as 521 Ridgeway Drive in Cincinnati, admitted that he had smoked marijuana in the car earlier that day, and gave consent for Benton and Muse to search the vehicle. The resulting examination of the interior of the car yielded "a small bag of marijuana and a loaded 9 millimeter High Point handgun," along with a razor blade covered with a white residue, all of which were concealed in the glove compartment.

Because a criminal history check of the defendant indicated that Beasley was a convicted felon, the officers placed him under arrest and seized $236 in cash that was

"wadded up" and "stuffed in his pocket." Benton then conducted a more thorough search of the Grand Am and found the rental slip for the car and a receipt indicating that a "Carlos Deasler" of 521 Ridgeway Drive in Cincinnati had made cash payments from December 29, 2002, through January 5, 2003, to rent Room 401 at the Extended Stay America in Covington, Kentucky. Benton later testified that, at that time, "Officer Muse knew around where Room 401 was, which was on the fourth floor and the interstate side, or west side, of the hotel; and he was watching up there and seen a female looking out, watching us from the room . . . ."

Benton and Muse radioed for additional assistance, and Sergeant Greg Sandel of the Kenton County Police Department and Sergeant Kenneth Holstein of the City of Covington Crime Suppression Unit soon arrived on the scene. Holstein, dressed in civilian clothes, proceeded to Room 401 of the hotel with a uniformed officer, ostensibly "as a courtesy" to "see if anybody was in the room, let them know what was going on and what would be happening from that point." Holstein, while displaying his badge, knocked on the door to the room and when a young woman, later identified as Teela Frye, opened the door, the police sergeant identified himself and asked whether he could "come in and talk." According to Holstein, "[w]hen she seen me and the other uniform, and I explained why I was there, when she allowed entry, she opened the door further and stepped back, allowing me to step into the hotel room."

Once inside the door, Holstein immediately observed "some baggies on the kitchenette-type counter" and "also some marijuana shake pieces [later defined as "the stems and pieces that fall off the actual leaf at the bottom of the bag"], small pieces of marijuana on that counter as well." The officer then inquired whether other individuals were present in the room and, despite Frye's denial, "did a quick protective sweep for officers' safety at that point where [he] walked through the rest of the hotel room and noticed some digital scales on one of the nightstands near the bed."

At that time, the various officers on the scene secured the area and obtained a search warrant for the room. When the warrant was delivered to the hotel, Officer Benton himself executed the search after also noticing that, upon entering the room, plastic bags and marijuana residue were plainly visible on the counter of the kitchen area. During his search, Benton observed not only the scales seen by Holstein during the "protective sweep," but also another firearm hidden in a shoe box, baking soda, a bag containing 19.639 grams of crack cocaine, and $1,200 in cash.

Based upon the evidence uncovered during the searches of Beasley's car and hotel room, the government sought and obtained a three-count indictment against the defendant, charging him with possession with intent to distribute more than five grams of crack cocaine, possession of two firearms after having been convicted of a felony, and possession of two firearms in furtherance of a drug trafficking crime. The defendant filed a motion to suppress the evidence obtained from the searches and an evidentiary hearing

was conducted by the district judge. At the conclusion of the proceedings, the court denied the suppression motion in its entirety. In doing so, the district judge determined that the defendant had "validly consented to a search of his rental vehicle," that Teela Frye "gave a valid consent to the officers' initial entry into Room 401," that the "zip lock type baggies and marijuana 'shake' were lawfully observed in plain view," that the "digital scale was lawfully observed during a brief protective sweep of the hotel room," and that the "search warrant affidavit, with or without the reference to the digital scale, established sufficient probable cause for its issuance."

Given the outcome of his suppression motion, Beasley entered a conditional plea of guilty to the charged offenses. The district court then sentenced the defendant to two concurrent 120-month prison sentences, the mandatory minimum both for the drug offense and for being a felon in possession of a firearm. The court also imposed a consecutive 60-month sentence, also mandatory, for possession of a firearm in furtherance of a drug trafficking crime. Consequently, Beasley received an effective prison sentence of 180 months. He now appeals the convictions but not the sentence.

## II.  DISCUSSION

### A.  Challenge to Count 3 of the Indictment

Despite the fact that Beasley reserved the right to appeal only the propriety of the district court's suppression decision, he now also asserts that he should not have been

convicted of possessing firearms in furtherance of a drug trafficking crime because the indictment improperly mixed the elements of the two separate offenses proscribed by 18 U.S.C. § 924(c)(1)(A). According to the defendant, such confusion in the charging instrument results in an indictment that fails to charge any offense at all. Beasley also contends that his counsel was ineffective for failing to object to the improper indictment.

We have explicitly recognized "that 18 U.S.C. § 924(c) criminalizes two separate and distinct offenses." *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004). Indeed, subsection (c)(1)(A), in relevant part, punishes "any person who, *during and in relation to* any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, *uses or carries* a firearm," as well as "any person . . . who, *in furtherance of any such crime*, *possesses* a firearm" (emphasis added). In *United States v. Mackey*, 265 F.3d 457, 461-62 (6th Cir. 2001), moreover, we explained that the "in furtherance of" language in the statute creates "a more stringent requirement than [the] 'during and in relation to'" language.

Inexplicably, the defendant argues in his appellate brief that "Mr. Beasley's indictment charges him using the same charging language as the Comb's [sic] indictment, both indictments charging each defendant with possession of a firearm during and in relation to a drug trafficking crime." Thus, Beasley contends that the charging instrument improperly referenced the "during and in relation to" language of the "use and carry"

offense for the offense of "possession" of a firearm, which should instead include the "in furtherance of" language of the statute.

Beasley, however, has simply misread the indictment in this case. Count 3 of the indictment clearly alleges that the defendant, "*in furtherance of* the drug trafficking crime set out in Count 1 of this indictment . . . did knowingly *possess* two firearms . . ." (emphasis added). Furthermore, during the plea hearing in this matter, the court spoke only in terms of *possession* of the firearms "in furtherance of your drug-trafficking crime, which is the possession of the crack with intent to sell."

Nevertheless, the actual judgment entered by the district court does mistakenly refer to "*[p]ossession* of firearm *during and in relation to* drug Trafficking crime" (emphasis added). In light of the fact that such an improper mixing of the elements of separate offenses did not occur at any other point in this prosecution, the lone, erroneous reference in the judgment itself must be viewed as a harmless, clerical error that may be corrected by the court at any time "[a]fter giving any notice it considers appropriate." Fed. R. Crim. P. 36.

## B. Validity of Searches

In his primary issue on appeal, Beasley asserts that the district court erred in denying his motion to suppress the introduction of the drugs, drug paraphernalia, and handgun recovered from the defendant's hotel room. According to Beasley, the search

warrant that led to the uncovering of the incriminating evidence was based upon

information obtained during an unjustified protective sweep of the room. Furthermore, the

defendant maintains that Teela Frye had neither actual nor apparent authority to consent

to any search of Room 401.

The Fourth Amendment to the Constitution of the United States provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Consequently, warrantless searches are presumed unreasonable unless they fall within

certain recognized exceptions to the warrant requirement. *United States v. Radka*, 904

F.2d 357, 360 (6th Cir. 1990).

In this case, the search of the defendant's hotel room that ultimately uncovered the

package of crack cocaine and one of the handguns that served as bases for his

convictions was conducted pursuant to a court-issued warrant. Beasley nevertheless

contends that the facts contained in the affidavit supporting the warrant were discovered

through unconstitutional means. Specifically, the defendant focuses upon the inclusion in

the affidavit of a reference to "a set of scales" that were observed by Sergeant Holstein

only while Holstein was conducting a protective sweep of the hotel room. Beasley insists

that because such a protective sweep was not justified in this matter, the warrant relying

on the fruits of that sweep was constitutionally defective and cannot support the admission into evidence of any of the items found during the search conducted pursuant to that authorization.

The United States Supreme Court has explained that "a 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). Furthermore, such a protective sweep is justified only "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* (citations and internal quotation marks omitted).

In this case, Holstein was aware that Beasley had been arrested in the parking lot outside of the Extended Stay America hotel and that both drugs and a firearm were found in the defendant's rental car. Additionally, another person was seen observing the arrest from a room believed to be the very room in which Beasley had been staying and from which he had apparently just left. It is true that, upon gaining entry into that room, Holstein observed only a female occupant, who complied with the officer's requests and who did not pose a physical threat either to Holstein or to any other individual. Nevertheless, even in the relatively cramped quarters of a hotel room, another more menacing and dangerous

individual could easily hide. Thus, because Holstein had no idea how many other individuals might have been in Room 401, he was justified in conducting the brief, 15-second sweep of the room to make sure other armed persons were not hiding behind beds or in the bathroom area.

Even had the sweep not been justified, however, and even had the scales found during the sweep not been mentioned in Benton's affidavit, probable cause still supported the issuance of the search warrant that led to the discovery of additional incriminating evidence in the hotel room. Regardless of what motivation Sergeant Holstein might have for knocking at the door to Room 401, the evidence is uncontroverted that Teela Frye opened the door wide in response to the rapping, according to her because she thought that the visitor was a pizza delivery man. After Holstein identified himself, after Frye was able to see a uniformed officer accompanying the plainclothes sergeant, and after Holstein stated, "I would like to come in and talk to you regarding a situation that is occurring . . .," she opened the door wider and stepped aside, giving the clear indication that the officers were allowed to enter the room. Once granted access to that vantage point, Holstein was able to observe, in plain view, plastic baggies and marijuana shake, items that together provided at least probable cause to believe that illegal drugs were being repackaged in the room for possible resale.

Beasley argues, however, that the plain view doctrine is not applicable in this situation. In this circuit, the plain view doctrine is properly invoked by the government only

when: (1) the officer is legally present in a location from which he or she can view the items; (2) the items are actually in plain view; (3) the incriminating nature of the items is readily apparent to the officer; and (4) the officer has a lawful right of immediate access to the items. *See United States v. McLevain*, 310 F.3d 434, 439 (6th Cir. 2002). The defendant does not now dispute that the marijuana "shake" and baggies could be seen from the area directly inside the door to Room 401, or that the illegal nature of the drugs on the counter was readily apparent to Holstein. Furthermore, because the police obtained a search warrant prior to the actual seizure of any evidence in plain view, the legality of the government's access to the items is not in question. Consequently, before this court, the defendant submits only that Holstein was not "legally present" within the hotel room, both because Frye did not consent to the police officers' entry and because she was without either actual or apparent authority to consent to such entry into Room 401.

At the outset of our analysis of the consent inquiry, we emphasize the important distinction between consent *to enter* a premises and consent *to search* that premises. Although identical standards are employed by a court when analyzing either issue, "when a defendant [or third party] consents to the entry of police officers, he or she does not automatically consent to a search." *United States v. Carter*, 378 F.3d 584, 593 n.2 (6th Cir. 2004) (en banc) (Moore, J., dissenting), *cert. denied*, 543 U.S. 1155 (2005). Without question, the resolution of this appeal does not depend upon whether Teela Frye gave Holstein consent *to search* Room 401. Indeed, Holstein did not communicate to Frye that he and the uniformed officer with him desired *to search* the premises; neither did Frye

either explicitly or implicitly grant such consent *to search* to the officers. Instead, the focus

of the germane inquiry on appeal is, as previously stated, simply whether Frye gave her

free, knowing, and voluntary consent for Holstein to step inside the room, a location from

which the uncontroverted evidence shows he was able to view items that were readily

identifiable as contraband.

In *Carter*, the en banc court, addressing a somewhat analogous situation, noted:

The investigating officers were instantly recognizable as policemen when Carter opened the [hotel room] door. They properly asked permission to enter, and Carter stepped back, letting them in. Any ordinary caller, under like circumstances, would understand assent to have been given, and the police are not held to a higher standard in this regard than an ordinary person.

\* \* \* \* \*

Fundamentally, Carter asks us to hold as a matter of law that consent must be given verbally, perhaps by some "magic words" formula. This we decline to do.

*Id.* at 588-89. Similarly, here, when Holstein knocked on the door to Room 401 of the

Covington Extended Stay America, Frye opened the door slightly, affording the officer the

opportunity to identify himself and request entry. When Frye then opened the door wider

and stepped back, Holstein, like any other reasonable person, assumed that he had been

given consent *to enter* the room.

Beasley contends that any consent to entry given by Frye was, nevertheless,

ineffective because Frye had neither actual nor apparent authority to acquiesce to

Holstein's request. In this circuit, however, "[i]t is well-established that a third-party can consent to a search of jointly occupied property, as long as the third-party has 'common authority' over the premises." *United States v. Moore*, 917 F.2d 215, 223 (6th Cir. 1990) (citation omitted). This is so, in part, because "a joint occupant assumes the risk of his co-occupant exposing their common private areas to a search." *Id.*[1] Moreover, paraphrasing a portion of the Supreme Court's decision in *Georgia v. Randolph*, which illustrates the importance of commonly held understanding about the authority of co-inhabitants:

> When someone comes to the door of a [hotel room dressed as if recently aroused from sleep], as [Teela Frye] did, she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer or any other visitor that if she occupies the place along with others, she probably lives there subject to the assumption tenants usually make about their common authority when they share quarters. They understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another.

126 S.Ct. at 1521-22 (describing *United States v. Matlock*, 415 U.S. 164 (1974)). Thus, in the absence of an express objection by Beasley, Frye had the authority, whether actual or apparent, to grant Holstein's request for entry into the defendant's hotel room.

Because Holstein was thus "legally present" in a place from which he could plainly view items that immediately appeared to him to be evidence of criminal wrongdoing, a plain view analysis was appropriately applied by the district court to justify the existence of

---

[1]Of course, as recently recognized by the United States Supreme Court, consent of one resident cannot override the express objection to search or entry by another, physically-present resident. *See Georgia v. Randolph*, 126 S.Ct. 1515, 1519 (2006). No such objection to the police entry into Room 401 was voiced by defendant Beasley in this matter, however.

- 13 -

probable cause necessary to issue a warrant to search Room 401 of the Covington

Extended Stay America. Beasley's challenge to the constitutionality of the search of the

hotel room that uncovered crack cocaine and an additional, illegally-possessed firearm is,

therefore, without merit.

## CONCLUSION

For the reasons set out above, we conclude that the district judge appropriately

denied the defendant's motion to suppress evidence obtained from Beasley's hotel room.

We therefore AFFIRM the judgment entered in this matter but REMAND with directions to

the district judge to correct the clerical error in the judgment order, pursuant to the authority

granted by Rule 36 of the Federal Rules of Criminal Procedure.