**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0615n.06

No. 19-5951

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Oct 30, 2020 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| JESSE GRAY, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |

**Before: STRANCH, BUSH, and LARSEN, Circuit Judges.**

**PER CURIAM.** Jesse Gray appeals his conviction for possessing with intent to distribute forty or more grams of fentanyl and possessing four firearms in furtherance of the drug offense. He argues that the district court improperly denied his motion to suppress incriminating evidence obtained from searches of an apartment he shared with Lawanna Hudson, his girlfriend and a co-defendant. For the reasons outlined below, we hold that (1) based on Hudson's consent to the initial warrantless searches of the apartment, those searches did not violate Gray's Fourth Amendment rights; and (2) the evidence obtained from the warrantless searches properly served as the basis for a valid warrant obtained for the final search of the apartment. Therefore, we **AFFIRM**.

**I.**

This case arises from a domestic violence call made by Hudson to the police on June 15, 2018. She called to report an argument with Gray that had turned violent in their shared apartment

in Lexington, Kentucky.  There, the responding officers encountered Gray on the stairs outside of the apartment.  The officers then knocked on the front door of the apartment.  Hudson, surrounded by her small children, opened the door from inside the apartment and invited the officers in.

Once the officers had entered her home, Hudson offered them details regarding the domestic violence.  According to Hudson, it had begun after she confronted Gray for slashing her tires.  Hudson stepped toward the kitchen and gestured for the officers to follow as she described her argument with Gray.  Pointing toward the bedroom, Hudson recounted that Gray had taken a nightstand from the bedroom and smashed it on the kitchen floor.  He had also, according to Hudson, pulled her hair and thrown her to the ground.  Hudson told officers that she had responded to Gray by "bust[ing] up" a TV in the room.  R. 28-1, 01:10–01:30 (noting that it was damaged with her key).  The broken nightstand was visible on the kitchen floor next to an open bedroom door.

Officer Christopher Flannery, one of the police officers at the scene, walked over to the broken nightstand and into the open bedroom from which it came.  He surveyed the bedroom with a flashlight for approximately twenty seconds while Hudson, who had followed him, retrieved her identification card and explained which of the various belongings scattered across the room belonged to her and which belonged to Gray.  A small sack of marijuana was visible on the bed, and bags containing pills and marijuana stems were nearby on the floor.  Hudson told Flannery that she had been "smoking weed" earlier.  R. 65 at PageID 269.  Flannery then followed Hudson back to the kitchen.

Based on Hudson's statements and the damage visible in the apartment, the officers arrested Gray.  They discovered more marijuana and a substantial amount of cash on Gray's

2

person. Flannery then returned to the previously searched bedroom, where he spent roughly fifteen seconds looking again at the bags containing pills and marijuana stems.

Flannery next came back to the kitchen and asked Hudson for her consent to search the entirety of the bedroom. Hudson replied, "Go ahead. I don't have [anything] back there." R. 28-6, 00:24–00:26. Flannery then went outside the apartment and asked Gray for consent to search the room, to which Gray stated, "this is [Hudson's] house." R. 28-8, 00:04–00:06. When Flannery again asked Gray whether he "ha[d] a problem" with the officers searching the bedroom, Gray responded, "No." R. 28-8, 00:09–00:12; *see also* Appellant Br. at 9–10.

The officers' search of the bedroom revealed a magnetic lock box attached to a metal bed frame, which contained approximately 200 grams of a heroin and fentanyl mixture. In addition, the officers seized a kilo press commonly used by drug traffickers, acetone (also commonly used in preparing drugs), a safe, baggies, and a loaded firearm.

In reliance on this seized evidence, officers obtained a warrant to search the rest of Hudson's apartment and the safe. Officer Danny Page, who arrived after Officer Flannery had retrieved the marijuana and placed it on the kitchen table, prepared the search warrant affidavit. In the affidavit, Officer Page erroneously stated that the marijuana had been found on the kitchen table, as opposed to in the bedroom. During the ensuing search pursuant to the search warrant, the police found multiple loaded firearms, cocaine, cash, and marijuana inside the safe. Officers also found pawn shop receipts linking Gray to the items in the safe.

A federal grand jury then indicted Gray and Hudson for possession with intent to distribute forty grams or more of a substance containing a detectable amount of fentanyl (Count 1) and possession of a firearm in furtherance of a drug trafficking crime (Counts 2 and 4). Gray was also charged with being a felon in possession of a firearm (Count 3).

Gray and Hudson filed a joint motion to suppress the evidence obtained at the apartment. The district court denied the motion. Subsequently, Gray pleaded guilty to possessing with intent to distribute forty or more grams of fentanyl and possessing four firearms in furtherance of the drug offense. The terms of the plea deal reserved Gray's right to appeal the district court's denial of his motion to suppress. The district court then sentenced Gray to a 132-month term of imprisonment. Gray timely filed a notice of appeal.

**II.**

On appeal, Gray challenges the district court's denial of his motion to suppress the evidence that officers seized from the apartment. Gray's argument implicates four discrete searches of the bedroom: (i) Flannery's first search, shortly after entering the apartment; (ii) Flannery's second search, after Gray's arrest; (iii) Flannery's third search, after explicitly asking Hudson and Gray for consent; and (iv) the fourth search, pursuant to the search warrant. Gray argues that the first three searches were unlawful and, consequently, that the evidence uncovered from execution of the search warrant must be suppressed because the warrant was obtained with information derived from those earlier unconstitutional searches.

"When reviewing the denial of a motion to suppress, we review the district court's legal conclusions de novo and the factual findings for clear error." *United States v. Taylor*, 248 F.3d 506, 511 (6th Cir. 2001) (citing *United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996)). "When a district court has denied a motion to suppress, [this court] consider[s] the evidence in the light most favorable to the government" and "will overturn the district court's factual findings only if we have the definite and firm conviction that a mistake has been committed." *United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006) (internal quotation marks and citations omitted).

4

### A. The Warrantless Searches

We first address the searches of the apartment conducted by the officers before they obtained the warrant. As we explain below, the constitutionality of these searches is established by undisputed facts that demonstrate that Hudson's consent led to the chain of events in those searches.

We reach our holding based on well-established law in this area. The Fourth Amendment, of course, "guarantees the right to be free from unreasonable searches and seizures." *Taylor*, 248 F.3d at 511. Among the grounds to deem a search and seizure constitutionally reasonable are if they are "made pursuant to a warrant," *id*., or if the person whose property is to be searched gives consent, *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc).

"Consent to a search may be in the form of words, gesture, or conduct." *Id*. (internal quotation marks and citation omitted). In order to justify a search by consent, "[t]he government bears the burden of demonstrating by a preponderance of the evidence, through 'clear and positive testimony,' that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by any duress and coercion.'" *United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020) (quoting *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009)); *see also Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

Consent can come from anyone with "common authority" over the property. *See United States v. Moore*, 917 F.2d 215, 223 (6th Cir. 1990). "This is so, in part, because 'a joint occupant assumes the risk of his co-occupant exposing their common private areas to a search.'" *United States v. Beasley*, 199 F. App'x 418, 424 (6th Cir. 2006) (quoting *Moore*, 917 F.2d at 223). Nevertheless, "consent of one resident cannot override the express objection to search or entry by

another, physically-present resident." *Id.* at 424 n.1 (citing *Georgia v. Randolph*, 547 U.S. 103, 106 (2006)).

### 1. The First and Second Searches

The district court held that the first and second warrantless searches of the bedroom were constitutional as protective sweeps. We agree that those searches were constitutional but affirm on a different ground—namely, that Hudson's consent to Flannery's initial search of the bedroom is a sufficient basis on which to uphold both searches. Therefore, we need not address whether these searches qualify as protective sweeps. This court is "free to affirm . . . on any basis supported by the record . . . especially . . . where the underlying facts are undisputed." *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002). Here, undisputed facts establish that Hudson gave consent that led to the first and second searches.

"Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of all the circumstances.'" *Carter*, 378 F.3d at 587 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Furthermore, "the scope of the consent given determines the permissible scope of the search." *United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004) (citation omitted). The standard for measuring the scope of a person's consent is objective reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Considering Hudson's "words, gesture[s], [and] conduct," *Carter*, 378 F.3d at 587, we ask how "the typical reasonable person [would] have understood . . . the exchange" between her and the officers, *United States v. Lucas*, 640 F.3d 168, 175 (6th Cir. 2011) (quoting *Jimeno*, 500 U.S. at 251).

A reasonable person interprets the scope of a consensual search in light of its purpose. *See Garrido-Santana*, 360 F.3d at 576 ("Generally, the expressed object of the search defines the scope

of that search."). Thus, in *Garrido-Santana*, we held that the insertion of a fiber optic scope into a car's gas tank was within the scope of the driver's consent to search the car for drugs. *Id.* at 570, 576. Because the purpose of the search was to look for drugs, we concluded that a reasonable person would have understood the scope of the driver's consent to include "any container within th[e] vehicle that might have held illegal contraband," even the gas tank. *Id.* at 576; *see also Lucas*, 640 F.3d at 175–78 (holding that the district court did not clearly err by concluding that the search of a computer was within the scope of a consent to search the house for "narcotics-related evidence").

Here, the purpose of the officers' entry into the apartment was the corroboration of Hudson's allegations against Gray. Hudson had called the police to report the altercation with Gray. When the officers arrived, she immediately invited them inside and began to describe the incident. She motioned the officers into the kitchen, pointing to debris from the altercation on the floor. That debris included a broken nightstand lying in front of an open bedroom door. Hudson then explained that Gray had taken the nightstand from the bedroom before smashing it on the floor and that a TV was "bust[ed] up" in the bedroom. A reasonable person would have understood Hudson's consent as permitting the officers to survey the bedroom where part of the alleged altercation took place. *See Garrido-Santana*, 360 F.3d at 576.

Hudson's subsequent lack of objection to Flannery's entry into the bedroom confirms that conclusion. Although "mere acquiescence does not suffice to establish free and voluntary consent," *United States v. Moon*, 513 F.3d 527, 538 (6th Cir. 2008), we have repeatedly considered the absence of any objection when measuring the scope of an otherwise valid consent. *See Lucas*, 640 F.3d at 178 ("Lucas did not at any time object to the computer search that was taking place in his presence, nor did he withdraw his consent to search."); *Canipe*, 569 F.3d at 606 ("During the

search, Canipe made no attempt to revoke or delimit the scope of his omnibus consent . . . ."); *Garrido-Santana*, 360 F.3d at 576 ("We note that, although defendant had the opportunity to do so, he never objected to the officers' search of the gas tank and, thus, neither clarified that the scope of his sweeping consent excluded such a search nor revoked his consent.").[1] Here, after explaining that part of the altercation took place in the bedroom and gesturing toward the broken nightstand on the floor next to the open bedroom door, Hudson followed Flannery into the bedroom and made no objection as the officer surveyed the room to corroborate her story. A reasonable person observing this encounter would have concluded that Flannery acted within the scope of Hudson's consent. *See Garrido-Santana*, 360 F.3d at 576.

This is not to say that officers may search the entirety of a house or apartment whenever they receive consent to come inside. The scope of a person's consent depends on the context of the entire situation. *See Lucas*, 640 F.3d at 178. Thus, generally, "consent to enter one's threshold for the limited purpose of talking about an investigation does not include permission to enter a bedroom . . . ." *Mejia*, 953 F.2d at 466. But where, as here, officers receive "subsequent implied consent" to carry their investigation further into the apartment, entry into a bedroom is permissible. *See id.* ("However, once the officers were in the house, Cajigas gave a subsequent implied consent to let them enter the bedroom by not objecting when the officers followed her into the bedroom."). Here, Flannery's first search of the bedroom did not exceed the scope of the express and implied

---

[1] Other circuits have applied similar reasoning. *See, e.g.*, *United States v. Davis*, 60 F.3d 825 (Table), 1995 WL 391985, at *3 (4th Cir. 1995) ("Afolabi let the officials into the apartment, walked into the living room/dining area, continued into the bedroom, and did not object as the officials followed him."); *United States v. Mejia*, 953 F.2d 461, 466 (9th Cir. 1991), *abrogated on other grounds by Koon v. United States*, 518 U.S. 81 (1996) ("Presumably, a reasonable person who objected to the officers' following her would have said so."); *United States v. Pena*, 920 F.2d 1509, 1515 (10th Cir. 1990) ("[F]ailure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of the consent." (citation omitted)).

consent Hudson provided when she invited the officers into the apartment, described the incident, gestured to the officers to survey the damage, and followed Flannery into the bedroom without objecting as he sought to corroborate her allegations. Accordingly, based on Hudson's consent, we **AFFIRM** the district court's holding that the first search was constitutional.

Our decision with respect to the first search also disposes of Gray's argument with respect to the second search. Flannery returned to the bedroom intending to seize the bags of pills and marijuana stems after seeing those items in plain view during the first consensual search, but he decided not to seize anything at that time. The second search accordingly yielded no information or evidence that Flannery had not already gleaned. Thus, we need not address whether the second search was constitutional based on consent or some other ground, because "[e]vidence 'will not be excluded . . . unless the illegality is at least the "but for" cause of the discovery of the evidence,' unless[,] that is[,] 'the challenged evidence is in some sense the product of illegal governmental activity.'" *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011) (second alteration in original) (citation omitted). The second search yielded nothing new.

Therefore, based on Hudson's consent, we **AFFIRM** the district court's judgment that the evidence obtained from the first and second warrantless searches is admissible.

**2. The Third Search**

Hudson's consent also establishes the constitutionality of the third search. The district court upheld the search on this ground, which we review for clear error. *See United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc).

The proof demonstrates no clear error in the district court's findings that Gray initially disclaimed an ownership or privacy interest in the apartment and that Hudson gave consent to the

search. Hudson called the police to come to the apartment and, once the officers arrived, indicated that they should investigate the scene of the alleged domestic violence.

Gray cannot show that the district court clearly erred in determining that Hudson's consent was clear and unequivocal. As Officer Flannery testified, when he asked Hudson if he could search the apartment, she responded: "Go ahead. I don't have [anything] back there." R. 65 at PageID 275. Body camera footage from the scene supports Officer Flannery's testimony. R. 28-6, 00:24–00:26.

There was also no clear error in the district court's finding that Hudson's consent was voluntary. Gray offers no evidence suggesting that Officer Flannery engaged in a coercive interrogation of Hudson to gain her consent. *See* Gray's Brief at 9–10. Quite to the contrary, in fact: Hudson affirmatively called the police to report a domestic violence incident, invited the officers into her home, and then provided details of her fight with Gray—all actions that suggest she was seeking their help to investigate the domestic violence and corroborate her claims. *See Smith v. City of Wyoming*, 821 F.3d 697, 712 (6th Cir. 2016).

Finally, Hudson's consent alone was sufficient to justify the officers' search. Like the co-inhabitant of the property in *Beasley*, Gray had the right as a co-habitant to object to the search. He, however, initially responded to the search request by expressly disclaiming any ownership or privacy interest in the apartment. *See Beasley*, 199 F. App'x at 424. When Flannery asked Gray again whether he "ha[d] a problem" with the officers searching the bedroom, Gray responded, "No." R. 28-8, 00:09–00:12. Gray's assertion that he did not give consent is of no import, given that it is undisputed that Gray initially disclaimed any ownership or privacy interest and that Hudson gave her consent.

Accordingly, we **AFFIRM** the district court's judgment that the third search was constitutional.

## B. The Search Warrant

Finally, Gray seeks to invalidate the search warrant obtained by way of the affidavit provided by Officer Page. Gray claims that the information in the affidavit was "taint[ed]," Gray's Brief at 8, because the information related to evidence that was unconstitutionally seized during the first three searches of the residence. Gray also argues that because the affidavit contained inaccurate information regarding the location of the original bag of marijuana, it lacked sufficient details to show probable cause and justify the issuing of a warrant. We find none of these arguments to be persuasive.

Because, as explained above, the first search was constitutional, all of the evidence the officers obtained from that search and verified through the follow-up second search—including the bags of marijuana and white pills—were properly included in Officer Page's affidavit. Likewise, because there was consent to the third search of the bedroom, the affidavit properly referenced that evidence as well. This proof included a magnetic lock box containing 200 grams of a heroin and fentanyl mixture, a kilo press commonly used by drug traffickers, acetone commonly used for the preparation of drugs, a safe, baggies, and a loaded firearm.

Officer Page's affidavit properly outlined all of the evidence seized by the officers during the warrantless—but lawful—three searches. The only mistake in the affidavit related to the description of the location of the marijuana. The drug was erroneously described as being found on the kitchen table, as opposed to the bedroom, where it was actually seized before being placed on the table by Officer Flannery. Nonetheless, the affidavit's misstatement of location was immaterial. Gray's charges—(1) possession with intent to distribute forty grams or more of a

substance containing a detectable amount of fentanyl; (2) possession of a firearm in furtherance of a drug trafficking crime; and (3) being a felon in possession of a firearm—all relied necessarily on the existence of the evidence obtained from the third lawful search that had nothing to do with whether the baggie of marijuana was located in the kitchen, as opposed to in the bedroom. Consequently, the "lawfully obtained information amount[ed] to probable cause and would have justified issuance of the warrant apart from the tainted information" regarding the location of the baggie. *United States v. Smith*, 730 F.2d 1052, 1056 (6th Cir. 1984) (citation omitted).

Accordingly, we **AFFIRM** the district court's denial of the motion to suppress evidence seized pursuant to the search warrant, because the search warrant was substantiated by sufficient evidence to establish probable cause. *See id.* at 1056–57.

**III.**

For the foregoing reasons, we **AFFIRM** Gray's judgment of conviction.