RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 11a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 09-6035/6061

ALEXANDER LUCAS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 08-00026-001—Jennifer B. Coffman, Chief District Judge.

Argued: December 8, 2010

Decided and Filed: May 11, 2011

Before: MOORE and STRANCH, Circuit Judges; COHN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Monica L. Thompson, DLA PIPER LLC (US), Chicago, Illinois, for
Appellant. David R. Weiser, ASSISTANT UNITED STATES ATTORNEY, Louisville,
Kentucky, for Appellee. **ON BRIEF:** Monica L. Thompson, DLA PIPER LLC (US),
Chicago, Illinois, for Appellant. Monica Wheatley, Terry M. Cushing, ASSISTANT
UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. Following entry of a conditional guilty plea
to charges of possessing and receiving child pornography, Alexander Lucas ("Lucas")
appeals the district court's denial of his motion to suppress graphic photographs and

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan,
sitting by designation.

1

videos that were discovered on his laptop computer during a consent search of his residence for controlled substances, drug paraphernalia, and "other material or records pertaining to narcotics." In view of the totality of the circumstances presented in the case, we conclude that Lucas granted voluntary consent to search and that the laptop search did not exceed the scope of his consent. For these reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On December 18, 2007, Det. Donald Burbrink with the Louisville Metro Police Department received information from a fellow detective that a reliable confidential informant (CI) disclosed to him that Lucas was growing marijuana inside his home at 3750 Boone Street in Louisville. At that time, Lucas was a 25-year-old college graduate with a bachelor's degree in economics.

Around 5:30 p.m. the same day, Burbrink and Sgt. Jason Lainhart visited Lucas at his home to conduct a "knock and talk." The officers were dressed in plain clothes with their police badges visible. For tactical reasons, they approached the back door and knocked. When Lucas opened the door, Burbrink identified himself as a police detective and asked to talk with Lucas. Lucas invited the officers inside, so they stepped into the laundry room, where they immediately smelled the aroma of burnt marijuana.

Burbrink stated he had heard there was marijuana in the house and he would write a citation if Lucas possessed drug paraphernalia or a small amount of marijuana for personal use. While Lucas and the police officers were talking, Burbrink noticed a marijuana pipe on a shelf in plain view, so he asked if Lucas possessed any similar items. Lucas produced a box containing rolling papers, marijuana pipes, and marijuana residue or "shake," but he denied there were any other drug-related items in the house. The tone of this exchange was conversational, the officers did not threaten to arrest Lucas, and no police weapons were drawn. Lucas did not appear to be intoxicated, and he answered questions intelligently. During the conversation, three more police detectives arrived at the back door of the house.

Burbrink asked Lucas to sign a consent form to allow a search of his house, but Lucas hesitated. The officers could tell that Lucas did not want to sign the form. Burbrink explained that probable cause existed to obtain a search warrant that night based on the marijuana pipe in plain view, the aroma of smoked marijuana, the drug paraphernalia Lucas produced, and information provided by a CI that Lucas was growing marijuana and hosting marijuana-smoking parties. When Lucas did not sign the form, Sgt. Lainhart began a protective sweep to secure the house in anticipation of obtaining a search warrant.

Lucas gestured to Det. Burbrink and said, "What do I have to sign?" Burbrink interpreted the gesture to mean that Lucas knew the officers had enough evidence to obtain a search warrant and would do so. Burbrink verbally reviewed the consent form to inform Lucas of his constitutional right to refuse permission to search. Burbrink also orally advised Lucas of his right to stop the search at any time. Lucas signed the consent form at 5:45 p.m., approximately ten minutes after the officers first arrived. If Lucas had not signed the consent form, the police would have sought a search warrant. By signing the form, Lucas agreed that the officers could search his residence for illegal controlled substances, drug paraphernalia, and "other material or records pertaining to narcotics."

Because the CI had disclosed that the marijuana growing operation was located in Lucas's bedroom, the officers searched there first. Inside the closet, they found a number of marijuana plants, each separately potted and named.[1] Lainhart noticed a digital camera sitting on a night stand near the closet. Based upon his training and experience, he knew that marijuana growers commonly take "bragging" photographs. He reviewed the digital images on the camera and found some that depicted marijuana usage. The officers made no effort to search a desktop computer located in the bedroom.

---

[1] Lucas argues for the first time on appeal that Lainhart must have located the marijuana plants in the bedroom closet during his protective sweep of the house, even before Lucas signed the consent-to-search form while standing in the laundry room. This issue is not properly before us for review. But even if it were, the evidence shows that Lucas agreed to the search of his residence while Lainhart was conducting the protective sweep. By the time Lainhart returned to the laundry room, Lucas had already signed the consent form. The evidence does not confirm that Lainhart found the marijuana plants during his protective sweep or that he found the plants before Lucas granted consent to search his residence.

After the marijuana plants were found, Burbrink and Lucas moved to the living room, where they talked and played video games while the search continued. The living room was the last place searched.

Upon entering the living room, Lainhart noticed a laptop sitting on a small table in the corner. On the keyboard tray, Lainhart discovered a handwritten marijuana plant "grow chart." The first page contained a numbered list of the named marijuana plants found earlier in the bedroom closet, as well as height measurements, pot sizes, and recent notes about the plants. The second page was a similar blank chart. The third page appeared to be Lucas's general "to-do" list, although the word "clones" appeared at the bottom of the page.

Lainhart decided to look on the laptop's hard drive for an Excel spreadsheet similar to the handwritten grow chart. Based on his training and experience, he knew that marijuana growers commonly keep similar data and digital photographs on computers and upload the information to the Internet. Standing near the laptop in Lucas's direct line of sight, Lainhart asked if the computer was password-protected, and Lucas responded that it was not. Lucas did not object to a search of his laptop, or claim that a search would exceed the scope of his consent to search, or try to withdraw his consent to search.

Burbrink then asked Lucas how he learned to grow marijuana. Lucas replied that he used a share program on the Internet designed to allow people to provide marijuana growing tips to each other. He explained that he cloned plants for re-sale.

In searching the computer, Lainhart first opened the "My Documents" folder, but he did not find any Excel spreadsheets. Next, he opened the "My Photos" folder, but he did not locate any drug-related photos. He found some photographs of Lucas in the nude and briefly joked with Lucas about those photographs.

Lainhart then noticed a removable thumb drive connected to the computer. When he accessed that drive, thumbnail images of child pornography appeared on the screen. He viewed six or seven images to confirm that he had discovered child

pornography. He stopped searching the computer, turned to Burbrink and said, "That guy is under arrest." Lucas asked what was going on, but Burbrink did not know. Lainhart then revealed that he had found a lot of "kiddie porn." He contacted the Crimes Against Children Unit (CACU) and asked for assistance.

Burbrink handcuffed Lucas's wrists in the front and placed him under arrest. Lucas said, "I have a problem." Burbrink told Lucas to stop talking and to wait for the CACU detectives to arrive. During the next hour, the detectives offered Lucas chips and a drink and allowed him to smoke cigarettes. Lucas and Burbrink continued to play video games.

CACU Detectives Daniel McNamara and Mark Wampler, dressed in plain clothes, responded to Lainhart's call. McNamara received a brief synopsis of events from Lainhart and then approached Lucas, who was still sitting handcuffed on the sofa. Although McNamara detected a faint odor of smoked marijuana, Lucas was not intoxicated and he was very cooperative.

McNamara identified himself as a CACU detective and stated he was interested only in Lucas's computers. Upon McNamara's request, Lucas signed a second consent form at 8:21 p.m., granting McNamara permission to seize and examine the computers, computer media, and peripheral equipment. The form instructed Lucas of his constitutional right to refuse permission to search. Lucas did not tell McNamara that he refused consent to search his computers or that he had not consented to a search of his residence.

After the evidence was gathered, officers transported Lucas to the police station. McNamara read Lucas the *Miranda* rights, and Lucas signed and initialed a rights waiver form at 9:20 p.m. A short video clip of the interview shows McNamara and Lucas seated at a small table in a windowless interview room with the door shut. Lucas sat in the corner facing into the room. McNamara asked Lucas to tell him what happened at the house before McNamara arrived. Lucas calmly explained the events in the laundry room and then said, "They asked me for consent to search, which I gave them."

Two days later McNamara obtained a state search warrant for the Lucas residence, the laptop and desktop computers, the thumb drive, assorted DVDs, VHS tapes and CDs, and other related equipment seized from the residence. He did so to permit a technician to complete a forensic examination of the computers in the event Lucas decided to withdraw his consent to the search. The forensic examiner recovered more than 900 images of child pornography and more than 300 minutes of footage in at least 45 videos of child rape.

A grand jury charged Lucas with knowing possession and receipt of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) & 2252A(a)(2). Lucas moved to suppress his statements and all of the evidence seized. The district court, adopting as modified a Report and Recommendation issued by a magistrate judge, denied the motion to suppress. Lucas then entered his conditional guilty plea to the child pornography charges.[2] The district court imposed a prison sentence of 90 months, to be followed by 10 years of supervised release. This timely appeal followed.

### *DISCUSSION*

### I.      Standard of Review

When reviewing the denial of a motion to suppress, this Court examines the district court's factual findings for clear error and its conclusions of law *de novo*. *United States v. Bowers*, 594 F.3d 522, 525 (6th Cir.), *cert. denied*, 131 S.Ct. 340 (2010). A factual finding is clearly erroneous when, although there is evidence to support the finding, the Court is left with the definite and firm conviction that a mistake has been committed. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). If there are two permissible views of the evidence, the district court's determination cannot be clearly erroneous. *Id.* at 574. This Court reviews the evidence in the light most likely to support the district court's decision. *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009).

---

[2]Lucas entered an unconditional guilty plea to manufacturing marijuana in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(D), but he did not raise on appeal any issues concerning that conviction.

**II.      Voluntary Consent To Search**

Lucas first contends that the police coerced him to sign the initial consent form and, as a result, he did not grant voluntary consent to a search of his residence and computers.  While the government urges us to reject this argument as both abandoned and waived below, the government also contends that Lucas cannot prevail on the merits of this issue in any event.

*1. Abandonment and waiver*

Ordinarily, an issue that is not raised in the district court is not considered on appeal unless the question is presented with sufficient clarity and completeness for us to resolve the matter without further development of the record.  *See Lockhart v. Napolitano*, 573 F.3d 251, 261 (6th Cir. 2009).  Additionally, the waiver rule of *Thomas v. Arn*, 474 U.S. 140, 146 (1985), is not jurisdictional, and a party's failure to file specific objections to a magistrate judge's report and recommendation may be excused in the interest of justice.  *Kent v. Johnson*, 821 F.2d 1220, 1222-23 (6th Cir. 1987).

It appears to us that Lucas abandoned the consent issue by not discussing it in his supplemental brief filed after the suppression hearing and that Lucas waived the issue by not making a specific objection in response to the Report and Recommendation.  We nonetheless choose to exercise our discretion to address the question in the interest of justice because the record is sufficiently clear and complete to make a determination. We review, however, only for plain error.  Fed. R. Civ. P. 52(b); *Thomas*, 474 U.S. at 155 & n.15.  Lucas must show that (1) an error occurred; (2) the error was plain, i.e., obvious or clear; (3) the error affected his substantial rights; and (4) the error seriously affected the fairness, integrity or public reputation of the judicial proceedings.  *United States v. Davis*, 514 F.3d 596, 615 (6th Cir. 2008).

*2. Lucas has not shown plain error*

The Fourth Amendment permits a search without a warrant if valid consent to search is given. *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010); *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006). "The government bears the burden of demonstrating by a preponderance of the evidence, through 'clear and positive testimony,' . . . that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir.) (quoting *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999)), *cert. denied*, 130 S.Ct. 655 (2009). Whether the government carried this burden is a question of fact to be decided from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Hinojosa*, 606 F.3d at 881; *Canipe*, 569 F.3d at 602.

In evaluating the circumstances presented here, we first acknowledge that the "knock and talk" procedure used by the police is a legitimate investigative technique aimed at achieving a suspect's consent to search. *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005); *United States v. Chambers*, 395 F.3d 563, 567 n.2 (6th Cir. 2005). We consider Lucas's age, intelligence, and education; whether he understood the right to refuse consent to search; and whether he understood his constitutional rights. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). We also consider the length and nature of the detention, the use of coercive or punishing conduct by the police, and indications of more subtle forms of coercion that might have affected Lucas's judgment. *Id.* No single factor is dispositive. *Schneckloth*, 412 U.S. at 226. While knowledge of the right to refuse consent is one factor to be taken into account, the government is not required to establish such knowledge to show an effective consent. *United States v. Drayton*, 536 U.S. 194, 206-07 (2002). With these principles in mind, we examine the facts presented.

Lucas is a college-educated man who invited the officers into his home and conversed with them for approximately ten minutes. Upon entering the house, the police smelled burnt marijuana, observed a marijuana pipe in plain view, and examined the marijuana residue and drug paraphernalia that Lucas produced. The officers'

observations, combined with the information they obtained earlier from a reliable CI, provided sufficient probable cause to search the residence for narcotics-related evidence. Burbrink's warning that a search warrant would be sought if Lucas did not grant consent to search was a proper statement that did not taint the subsequent search. *See United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998).

Lucas argues that the police coerced him to sign the initial consent form. He points to the presence of five officers, Burbrink's initial failure to disclose the true reason why the police visited the home, Burbrink's promise to write a citation when he knew he was searching for a marijuana growing operation which, if found, would result in Lucas's arrest, and Lainhart's show of authority in conducting a protective sweep without explaining to Lucas why the sweep was done. Lucas contends that his gesture to Burbrink and his statement, "What do I have to sign?" can only be viewed as acquiescence to police authority due to an overborne will. *See Worley*, 193 F.3d at 386-387 (holding that suspect's response to airport police when asked for consent to search luggage, "You've got the badge, I guess you can," was not unequivocal statement of free and voluntary consent, but acquiescence and expression of futility in resistance to authority).

Having carefully evaluated the evidence under the plain error standard, we are not persuaded that Lucas's initial hesitation to grant consent to search is indicative of police coercion. Burbrink clearly informed Lucas of his constitutional right to refuse consent to search, as well as his power to stop a search at any time. Such circumstances distinguish the *Worley* case on which Lucas relies because in that case the defendant was not told of his constitutional right to refuse consent to search or his right to stop a search. *Worley*, 193 F.3d at 387. It is also notable that the request for consent to search occurred in Lucas's home, as opposed to the busy airport where Worley felt pressured to cooperate with police to avoid "'an untoward scene before the crowds of people[.]'" *Id.* (quoted case omitted); *Canipe*, 569 F.3d at 603.

Lucas's initial response to the request for consent to search indicates to us that Lucas knew he had a right to refuse the search and that he contemplated exercising that

right. Lucas apparently realized, however, that the police had sufficient evidence to obtain a search warrant and that they would do so. Through execution of a search warrant, the police certainly would uncover the marijuana growing operation–and perhaps the child pornography collection–that night. Faced with the gravity of the situation and the likely course of events, Lucas decided to cooperate with the police and actually did cooperate throughout the evening. He voluntarily signed two separate consent-to-search forms hours apart, he confirmed that his laptop was not password-protected, and he did not object to any aspect of the search after he signed the consent forms. *See United States v. Budd*, 549 F.3d 1140, 1146-47 (7th Cir. 2008) (holding defendant granted police voluntary consent to search his apartment and Seagate hard drive for child pornography when he twice granted verbal consent to search his apartment and twice signed consent-to-search forms at separate times). Most telling is Lucas's calm statement to McNamara during the interview that the police officers asked for his consent to search and he gave it to them.

Having considered this issue fully, we are convinced that Lucas did not establish plain error. The totality of the circumstances supports our determination that Lucas consented voluntarily to the search of his home for narcotics, paraphernalia, and "other material or records pertaining to narcotics."

### III.   The Scope Of The Consent To Search

The second issue before us is whether Lainhart's search of the laptop computer fell within the scope of Lucas's written consent to search his residence for narcotics-related evidence. We begin our analysis with the Supreme Court's pronouncements in *Florida v. Jimeno*, 500 U.S. 248, 251 (1991), that the scope of a search is generally defined by its expressed object and that the standard for measuring the scope of a suspect's consent under the Fourth Amendment is "'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect?"

In *Jimeno*, the suspect gave a police officer permission to search his car after the officer stated he was looking for drugs. *Id.* The question was whether it was reasonable

for the police officer to conclude that the suspect's general consent to a search of his car included consent to examine a container–a closed paper bag–lying on the floor of the car. *Jimeno*, 500 U.S. at 251. The Supreme Court held that a reasonable person would know narcotics are generally carried in some form of container; therefore, it was objectively reasonable for the police officer to conclude that the suspect's general consent to search the car also included consent to search containers within the car which might conceal drugs. *Id.* The Court refused to require the police to seek and receive permission from a suspect to search each closed container found within a car, observing that a "suspect may of course delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Id.* at 252.

In reversing the Florida Supreme Court's affirmance of the suppression order, the Court distinguished the facts in *Jimeno* from *United States v. Wells*, 539 So.2d 464 (Fla. 1989), where the Florida Supreme Court had held that a suspect's consent to search the trunk of a car did not include authority to open a locked briefcase found inside the trunk. *Id.* at 251. "It is very likely unreasonable[,]" the Supreme Court said, "to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk, but it is otherwise with respect to a closed paper bag." *Id.* at 251-52.

We followed *Jimeno* when we decided *United States v. Garrido-Santana*, 360 F.3d 565, 575-76 (6th Cir. 2004), also an automobile search case. We held that the search of the vehicle's gas tank fell within the scope of the suspect's written consent to search the car where the suspect knew the officer was looking for drugs and the suspect did not object to a search of the gas tank, did not clarify that the scope of his "sweeping consent" excluded such a search, and did not revoke his consent, even though he had opportunity to do so. *Id.* at 576. We determined it was objectively reasonable for the police to conclude that the "general consent to search the vehicle included consent to search any container within that vehicle that might have held illegal contraband." *Id.*

We also recognized that the Fourth Amendment did not require the police to obtain separate permission to search the gas tank. *Id.*

In *Canipe*, 569 F.3d at 604, also a vehicle search case, one issue we considered was whether police officers exceeded the scope of consent to "look in" a truck when they opened two closed containers found in the truck to discover a handgun and ammunition. Acknowledging that the question fell "between two genre of cases exemplified by" *Jimeno* and *Wells*, we observed that "[w]hile the officers did not convey to Canipe the object of their search (distinguishing [the] case from the permissible consent search in *Jimeno*), they also did not break or pry open locked containers (distinguishing [the] case from the impermissible consent search in *Wells*)." *Id.* at 605. We stated that "it is 'ordinarily' true that 'general consent [to a search] permits the opening of closed but unlocked containers found in the place as to which consent was given' even 'where officers did not tell the suspect the object of their search.'" *Id.* (citing, e.g., *United States v. Gant*, 112 F.3d 239, 243 (6th Cir. 1997)). Because the investigator in *Canipe* asked the suspect whether he had anything in his vehicle that might be unlawful, such questioning placed the suspect on notice that any unlawful item would be the subject of a search. *Id.* at 606. Thereafter, Canipe's general consent to search the truck "reasonably included permission to search any container that might have held illegal objects." *Id.* Canipe made no attempt to revoke or limit the scope of his consent, although he was at or near the scene of the search. *Id.* For these reasons, we held the district court did not clearly err in ruling that the search fell within the scope of Canipe's consent. *Id.*

We have not previously issued a published opinion applying the analysis of these automobile search cases in the context of a consent search of a personal computer located inside a private residence. In a similar child pornography case that was resolved in an unpublished opinion, we addressed the computer search issue briefly. *United States v. Cottle*, 355 F. App'x 18 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 3490 (2010). In that case, the defendant asserted on appeal that a sentencing enhancement should not apply because his father's consent to search the residence they shared did not give the police authority to search the defendant's personal computer located inside the residence. *Id.* at 21. We rejected the challenge, citing *Canipe* for the proposition that "[g]eneral

consent to search reasonably includes permission to search any container that might hold illegal objects." *Id.* Based on the third-party consent to search given to the police by the defendant's father, we determined that the search of the house and the computer was reasonable. *Id. See also United States v. Morgan*, 435 F.3d 660, 663-64 (6th Cir. 2006) (holding warrantless search of defendant's computer for child pornography was justified where police reasonably concluded from facts available that defendant's wife had apparent authority to consent to the computer search).

In this case, the defined object of the search, as clearly explained to Lucas, was the location and seizure of narcotics-related evidence. Like the district court, we believe a typical reasonable person, viewing objectively the exchange that took place between Lucas and the police in the laundry room, would determine that Lucas granted voluntary, written consent for the police "to make a complete search" of his residence for controlled substances, drug paraphernalia, and "other material or records pertaining to narcotics," and to "take from there any evidence pertaining to this investigation."

Before Lainhart touched the laptop, the police had already discovered the marijuana plants in the closet and the digital photographs on the camera depicting marijuana usage. Also, on the keyboard tray below the laptop, Lainhart had found a handwritten "grow" chart. Through training and experience, Lainhart knew that individuals involved in growing marijuana often save plant growth data on computers in the form of Excel spreadsheets and upload that information, along with "bragging" photographs, to the Internet. He also knew that individuals involved in dealing or using controlled substances commonly store narcotics-related records and photographs on their computers and other electronic devices. In fact, Lucas disclosed to the police that he utilized the Internet to learn how to clone marijuana plants for re-sale and that he used a share program to exchange information with other growers.

Upon finding the handwritten "grow" chart, Lainhart turned to Lucas, who sat a few feet away, and asked him if the laptop was password-protected. *See United States v. Stabile*, 633 F.3d 219, 232 (3d Cir. 2011) (password protection is a factor that may be considered in determining suspect's privacy interest in computer). Lucas responded that

it was not.  Lainhart then opened the "My Documents" folder to look for an Excel spreadsheet like the one he found in handwritten form, and he opened the "My Photos" folder to look for photographs of marijuana plants or usage.  Lucas did not at any time object to the computer search that was taking place in his presence, nor did he withdraw his consent to search.  He also did not make any effort to clarify that he did not contemplate a search of his laptop when he granted written consent to search his home for "other material or records pertaining to narcotics."

In light of these circumstances, the district court found that Lucas himself believed the search of his laptop fell within the scope of his initial written consent to search because he confirmed the computer was not password-protected and he did not in any way object to the search of electronic files.  The district court analogized the search of Lucas's non-secure laptop to the search of a closed, unlocked container, relying on *Jimeno* and several cases from other jurisdictions.  *See United States v. Al-Marri*, 230 F. Supp. 2d 535, 539-41 (S.D.N.Y. 2002); *United States v. Roberts*, 86 F. Supp. 2d 678, 688-89 (S.D. Tex. 2000), *aff'd,* 247 F.3d 1007 (5th Cir. 2001); *United States v. Barth*, 26 F. Supp. 2d 929, 936-37 (W.D. Tex. 1998); *United States v. O'Razvi*, No. 97 CR. 1250, 1998 WL 405048, at *6 (S.D.N.Y. July 17, 1998); *United States v. David*, 756 F. Supp. 1385, 1390 (D. Nev. 1991); and *United States v. Blas*, No. 90-CR-162, 1990 WL 265179, at *21 (E.D. Wis. Dec. 4, 1990).  In light of *Jimeno* and our own prior holdings in *Garrido-Santana* and *Canipe*, we cannot say that the district court clearly erred in making its findings.

Our decision to uphold Lainhart's entry into Lucas's electronic files based on the facts of this case should not be read as a grant of broad authority to the police to open a suspect's non-secured computer and examine at will all of the electronic files stored there.[3]  We have previously cautioned in the context of third-party consent that "[a]uthority to consent to a search of a residence is not necessarily co-extensive with authority to consent to a closed container stored in that area."  *United States v. Aaron*,

---

[3]We have no occasion to consider how our analysis might differ if Lucas's computer had been password-protected or if his electronic files had been encrypted or otherwise secured because such facts are not before us.

33 F. App'x 180, 184 (6th Cir. 2002). And the district court below shared our concern that analogizing computers to other physical objects when applying Fourth Amendment law is not an exact fit because computers hold so much personal and sensitive information touching on many private aspects of life. We recognize individuals have a reasonable expectation of privacy in the content of emails stored, sent, or received through a commercial internet service provider. *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010). And we know there is a far greater potential "for the 'intermingling' of documents and a consequent invasion of privacy when police execute a search for evidence on a computer." *United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001).

We uphold Lainhart's initial entry into Lucas's laptop because Lucas consented to the search of his non-secure computer for "other material or records pertaining to narcotics," the police had already found narcotics-related evidence that justified Lainhart's limited search for the same or similar drug-related records and photographs on the computer, and Lucas did not lodge any objection to the search of his computer, clarify the scope of his consent, or withdraw his consent.[4]

Finally, we agree with the district court's conclusion that Lainhart did not violate the Fourth Amendment when he accessed the removable thumb drive connected to the laptop and child pornography appeared unexpectedly on the screen. This case is not like *United States v. Carey*, 172 F.3d 1268, 1273 (10th Cir. 1999), where the police officer inadvertently discovered child pornography while searching a computer for drug-related documents. There the officer failed to stop searching the computer pending issuance of a search warrant and instead rummaged through the hard drive for five hours looking for additional child pornography. By contrast, Lainhart's actions mirror those of the police

---

[4]Lucas states that *Guest v. Leis*, 255 F.3d 325, 334-35 (6th Cir. 2001), stands for the proposition that, "in this circuit, individual computer files are treated as separate containers, at least in the context of a search warrant." Appellant's Br. at 22-23. *Guest* does not support Lucas's statement. The issue in *Guest* was whether a search warrant allowing police to search for personal communications related to the offense permitted the officers to seize the computer and search it off-site in order to separate files that were covered by the warrant from those that were not. *Guest*, 255 F.3d at 334-35. We held it was permissible for the police to seize the computer and search it later at another location due to the technical difficulties in searching a computer in a suspect's home. *Id.* at 335. *See also Stabile*, 633 F.3d at 234 (the practical realities of computer investigations counsel against on-site searches).

officer in *Walser*, 275 F.3d at 984-85, who, in searching a computer for drug-related evidence, stumbled upon one file that displayed numerous thumbnail images of girls engaged in sexual acts with men. Believing the material to be child pornography, the officer enlarged the thumbnails to confirm his belief and then immediately ceased searching in anticipation of obtaining a search warrant. *Id.* at 985. In that situation, the Tenth Circuit affirmed the denial of a motion to suppress because the computer search fell within the parameters of the initial drug search. *Id.* at 987. *See also United States v. Whaley*, No. 10-12255, 2011 WL 521174, at **4-5 (11th Cir. Feb. 16, 2011) (citing *Walser* where officer inadvertently found child pornography by opening an electronic file in a reasonable, though mistaken, belief that the file was the subject of the individual's consent); *United States v. Koch*, 625 F.3d 470, 476 (8th Cir. 2010) (distinguishing *Carey* where officers unexpectedly encountered child pornography on flash drive and promptly stopped searching to obtain a search warrant).

Similarly, in *United States v. Wells*, No. 3:08-cr-0003-JAJ, 2008 WL 2783264, at * 2 (S.D. Iowa July 15, 2008), a police officer conducted a consent search of a computer for records related to drug trafficking. *Id.* While searching, the officer found a file folder containing images of child pornography. The officer reviewed three pictures in a ten-minute period and then stopped searching, secured the computer, and obtained a search warrant. *Id.* The *Wells* court determined that the search for drug records on the computer fell within the scope of third-party consent to search the apartment, but that no objectively reasonable person could agree that consent was given to search the apartment purposefully for child pornography. *Id.* at *5. Because the officer discovered the child pornography accidentally and immediately stopped searching to obtain a search warrant, however, the motion to suppress was denied. *Id.* at *6.

We find the reasoning of these cases persuasive. Here there is no evidence that Lainhart intentionally searched for child pornography and purposefully exceeded the scope of Lucas's consent to search for "other material or records pertaining to narcotics." When thumbnail images suddenly appeared on the screen, Lainhart enlarged just a few of them to be certain he was looking at child pornography. Convinced of the unlawful nature of the material, he immediately stopped searching and called the CACU

detectives, who then obtained Lucas's voluntary consent, and subsequently a search warrant, to seize and search the computers thoroughly for child pornography.  As a result, we conclude that the district court did not err in its evaluation of the Fourth Amendment issues.

In light of our holding that Lainhart's search of the laptop fell within the scope of Lucas's voluntary consent to search, we need not consider whether Lucas's signature on the second consent form permitting a forensic examination of his computers was sufficiently attenuated from his signature on the first consent from to dissipate any taint caused by Lainhart's search of the laptop.  We also need not address the argument that the child pornography would have been discovered inevitably through execution of a search warrant.

### *CONCLUSION*

For the reasons set out above, we AFFIRM the judgment of the district court.