**UNITED STATES of America,**
**Plaintiff,**

v.

**Michael Nathaniel BOYD, Defendant.**

**Case No. 1:09–CR–192.**

United States District Court,
W.D. Michigan,
Southern Division.

June 29, 2011.

R. Clay Stiffler, U.S. Attorney, Grand Rapids, MI, for Plaintiff.

David Kaczor, Clare Elizabeth Freeman, Federal Public Defender, Grand Rapids, MI, for Defendant.

## *OPINION AND ORDER*

ROBERT J. JONKER, District Judge.

This matter is before the Court on Defendant's Motion to Suppress cocaine base and a firearm found during a search of 1200 Banbury Road, Apartment 9, as well

as Defendant's statements made during the search (docket # 13). The Court held an evidentiary hearing on the motion on April 20, 2011 (docket # 16). The parties filed supplemental memoranda regarding certain points discussed at the hearing (docket ## 23, 24). The Court has thoroughly reviewed the record and carefully considered the evidence. The motion is ready for decision.

## FACTS

Sometime in late 2008 or early 2009, the Kalamazoo Valley Enforcement Team (KVET) received an anonymous tip that a black male was conducting drug transactions from 1200 Banbury Road, Apartment 9, in Kalamazoo, Michigan. KVET did not investigate the tip until February 24, 2009, when Investigator Timothy Millard, assisted by Investigator Cory Ghiringhelli, attempted to make contact with persons in the apartment. Prior to February 24, 2009, neither officer made any inquiry into who lived at the apartment, nor did they do surveillance of the area to determine whether the tip had any merit. The government does not dispute that before approaching the apartment on February 24, the officers did not have probable cause to make an arrest or to search the residence.

The officers, both dressed in plainclothes, approached the door of the apartment, which was located on the exterior of the building and was accessible to the public. Investigator Millard testified that they went to the residence in the morning, Investigator Ghiringhelli could only remember that it was daylight, and Investigator Millard's incident report states that the incident was reported at 3:42 p.m. Investigator Millard's intention was to perform a "knock and talk," an investigation tool where an officer seeks to make contact with citizens in order to confront them with information the officer has received, and to seek consent to enter the home and discuss the matter further. To enhance the chances of gaining entry, officers try to induce face-to-face contact. Testimony established that officers also routinely lie to citizens about the extent or seriousness of the information they claim to have, or the purpose of their investigation, hoping the citizen will more readily consent to entry. Investigator Ghiringhelli served as the safety and cover officer; consequently, he could remember little of the actual conversations that took place in the case, as his focus was on the investigators' surroundings and safety.

Upon reaching the apartment door, Investigator Millard knocked once, but did not announce his identity. There was no response. Investigator Millard then knocked again. After the second knock, a female voice asked who was at the door. Investigator Millard lied and stated that he was "Tim from maintenance." When asked as to why he used this particular lie about his identity, Investigator Millard responded that there was no "rhyme or reason" for when he identified himself as a police officer or when he lied about his identity, because he used both methods of identification, even when he did not know the person on the other side of the door. He also said he hoped to induce face-to-face contact with the citizen, rather than be turned away without any contact. He made a spot judgment that the lie would facilitate his purpose. Speaking through the door, the female informed "Tim from maintenance" that she was not dressed and requested that he come back later. Investigator Millard responded that "we are not going to leave," and that he wanted to speak to the female and whoever else was in the apartment right then. After making this statement, a few minutes passed, and then the female, who was eventually identified as Nichol Martin, opened the door. Investigator Millard described the woman as "younger," and in fact the record indicates that Ms. Martin

was 18 years old at the time. Ms. Martin was described as wearing a robe or pajamas, which suggested to Investigator Millard that she had just woken up.

After Ms. Martin opened the door, presumably expecting to see "Tim from maintenance," she saw the two as yet unidentified officers in plainclothes. Investigator Millard identified himself as an officer with "Kalamazoo Public Safety." He also drew back his coat—it was February in Michigan—to display his badge, which was located on his waistband. He observed Ms. Martin's eyes look toward the badge. By his own estimate, Investigator Millard's badge was exposed for roughly eight seconds. Investigator Ghiringhelli believed he identified himself as well, but he could not remember what words he used.

Neither officer described themselves as police. Neither officer asked to talk with a person responsible for the apartment. Neither officer informed Nichol that, contrary to what they said about "not going to leave," she had no obligation to let them in and they would leave if she asked them to do so. Neither officer even repudiated the original lie of "Tim from maintenance," leaving open the very real possibility that the purpose of the visit was still related to an apartment maintenance issue related to "public safety." Investigator Millard stated that he wanted to come into the apartment to speak to her about an investigation he was conducting at the apartment complex. He did not back away from his earlier statement that "we're not leaving" nor did he disavow an apartment maintenance reason for his investigation. Nichol told him, "yeah, come on in" and opened the door wider to allow the officers' entry. Neither officer told Ms. Martin that she

had the right to refuse to consent to their entry into the apartment. Before entering the apartment, the officers did not ask Ms. Martin her age, her last name, or whether she lived in the apartment.

Upon entering the apartment, the officers remained near the front door, which opened up into the living room.[1] From that vantage point, Investigator Millard observed blankets or a mattress on the living room floor, where it appeared someone had been sleeping. Once inside the apartment, Investigator Millard used another lie and told Ms. Martin that the officers were investigating claims that people in the apartment possessed heroin. In fact the investigators had no such information. Upon hearing a noise in the apartment, Investigator Millard asked whether anyone else was in the apartment, and Ms. Martin told him that she was the only one there. Investigator Ghiringhelli noticed a hand in the reflection of a wall hanging, however, and one of the investigators told the person to come out into the living room. A black male, later identified as the defendant, entered the living room, identified himself as Michael Boyd and told the officers that Ms. Martin did not "stay" at the apartment, but that he did. Upon learning that Ms. Martin did not reside there, the officers did not ask Mr. Boyd whether he consented to their being in the apartment, or inform him that he had a right to refuse their presence.

After Mr. Boyd came into the living room, Investigator Millard repeated his lie about investigating heroin and also asked him whether there were any other drugs in the apartment. The defendant told him that there were not, and that in any case

---

1. The testimony reflected conflicting descriptions of the layout of the apartment, with Investigator Millard stating that the front door opened on the left side of the living room, near an interior wall between the living room and the bedroom, while Investigator Ghiringhelli described the door as opening on the right side of the living room, near the living room's exterior wall.

he was not sure he wanted the investigators to look around. Investigator Millard responded that in fact the officers were there to get consent to search the apartment. Mr. Boyd again stated that he was not sure he wanted the officers to look around the apartment. While engaged in this conversation, Investigator Millard says he observed a digital scale on the lower shelf of a glass-topped coffee table located in the living room, and after stepping back, he saw a bag of what he suspected to be crack cocaine next to the scale. When Mr. Boyd stated for the second time that he was uncomfortable with the officers looking around, Investigator Millard confronted the defendant with the scale and the suspected crack cocaine. He asked the defendant whether he could talk to him in the bedroom, to give him a chance to be honest, and Mr. Boyd agreed to speak to Investigator Millard. As they went toward the bedroom, Investigator Millard asked Mr. Boyd if Investigator Ghiringhelli could search the apartment. Mr. Boyd responded "yeah" and told the officers to "do what you have to do."

While in the bedroom, the defendant told Investigator Millard that the crack cocaine and scale were his and that he sold crack cocaine to pay his bills. Investigator Millard asked Mr. Boyd whether there were any weapons in the apartment, and Mr. Boyd told him that there was a gun in a box on the ironing board in the bedroom which belonged to him. During this exchange, Investigator Millard did not read the defendant his *Miranda* rights, although he did state that no matter what the officers found in the apartment that day, Mr. Boyd was not under arrest and would not be arrested that day. After finding the gun, Investigator Millard and Mr. Boyd discussed Mr. Boyd's possible cooperation, with Investigator Millard telling the defendant that he could "work it off." During this period, Investigator

Ghiringhelli remained in the living room with Ms. Martin.

After speaking to Mr. Boyd, Investigator Millard searched the rest of the apartment. In the kitchen he found a second bag of suspected crack cocaine. The total amount of crack cocaine found was 7.69 grams. He also found one document addressed to Michael Boyd, but did not find any residency paperwork in the home. The investigators then left the apartment without arresting anyone. Subsequently, Investigator Millard contacted the apartment manager who informed him that during the period in question, an Eddie Boyd was the leaseholder to the apartment.

On June 25, 2009, a federal grand jury returned a three-count indictment against Mr. Boyd. Count 1 charged him with possession with intent to distribute cocaine base; Count 2 charged him with being a felon in possession of a firearm; and Count 3 charged him with possession of a firearm in furtherance of the drug trafficking crime charged in Count 1. Mr. Boyd moved to suppress the evidence found by the police and the statements he made in the apartment. Upon review of the record and the opportunity for study and reflection, the Court is satisfied that the government has failed to meet its burden of proving that the totality of the circumstances reflects that Ms. Martin's consent to the officers' entry into the apartment was voluntary. Everything that the investigators ultimately found or learned on their visit flowed from that initial involuntary entry. Accordingly, the Court grants Mr. Boyd's motion to suppress the evidence found and the statements he made.

### DISCUSSION

### I. Legal Standard

■ "The Fourth Amendment generally prohibits the warrantless entry of a

person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *see Kyllo v. United States,* 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) ("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *United States v. Thomas,* 430 F.3d 274, 276 (6th Cir. 2006) (quoting *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)) ("[T]he Fourth Amendment has drawn a fine line at the entrance to the house."). "With few exceptions, the question whether a warrantless search of a home is reasonable and thus constitutional must be answered no." *Kyllo,* 533 U.S. at 31, 121 S.Ct. 2038. It is well settled, however, "that a person may waive his Fourth Amendment rights by consenting to a search." *United States v. Carter,* 378 F.3d 584, 587 (6th Cir.2004). The individual must have actual or apparent authority over the place being searched. *See Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793; *United States v. Stokes,* 631 F.3d 802, 807–08 (6th Cir.2011); *United States v. Gillis,* 358 F.3d 386, 390 (6th Cir.2004).

■■ "[C]onsent has effect only if it is given freely and voluntarily." *Carter,* 378 F.3d at 587. "[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntary consent must be "unequivocal and intelligently given, untainted by duress or coercion." *United States v. Cooke,* 915 F.2d 250, 252 (6th Cir.1990).

■■ "The government bears the burden of demonstrating by a preponderance of the evidence, through 'clear and positive testimony,' that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe,* 569 F.3d 597, 602 (6th Cir.2009) (quoting *United States v. Worley,* 193 F.3d 380, 385 (6th Cir.1999)) (internal citation omitted). "Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of the circumstances.'" *United States v. Carter,* 378 F.3d 584, 587 (6th Cir.2004) (quoting *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041). There is no "magic formula or equation" that determines whether consent is voluntary or not. *Id.* at 588 (quoting *Worley,* 193 F.3d at 387) (internal citation marks omitted); *see Schneckloth,* 412 U.S. at 224, 93 S.Ct. 2041 (the cases "yield no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen").

■ In examining the totality of the circumstances, the Court considers the "characteristics" of the person offering consent, "including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *United States v. Ivy,* 165 F.3d 397, 402 (6th Cir.1998); *see United States v. Lucas,* 640 F.3d 168, 174 (6th Cir.2011). The Court must also look to "the use of coercive or punishing conduct by the police" as well as "indications of 'more subtle forms of coercion that might flaw [an individual's] judgment." *Ivy,* 165 F.3d at 402 (quoting *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)). "In examining all the surrounding circumstances to determine if in fact the

consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth,* 412 U.S. at 229, 93 S.Ct. 2041.

 Because "[t]he Fourth Amendment can certainly be violated by guileful as well as forcible intrusions into a constitutionally protected area," *Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), the use of trickery, deception, and lies by police to gain entry into a home is a relevant factor in the consent analysis. *See United States v. Harrison,* 639 F.3d 1273, 1278 (10th Cir. 2011) ("deception and trickery are among the factors that can render consent involuntary"); *United States v. Turpin,* 707 F.2d 332, 334 (8th Cir.1983) ("Misrepresentations about the nature of an investigation may be evidence of coercion."). "Trickery, fraud, or misrepresentation on the part of the police to gain entry naturally undermines the voluntariness of any consent." *United States v. Griffin,* 530 F.2d 739, 743 (7th Cir.1976); *see Quintana v. Com.,* 276 S.W.3d 753, 759 (Ky.2008) ("use of a coercive ruse to obtain consent to enter a residence in the course of a knock and talk undermine[s] the purposes inherent in requiring consent to search absent a warrant"). Where "the effect of the ruse is to convince the resident that he or she has no choice but to invite the undercover officer in, the ruse may not pass constitutional muster." *United States v. Hardin,* 539 F.3d 404, 425 (6th Cir.2008) (quoting *United States v. Copeland,* 1996 WL 306556, *3, n. 3 (6th Cir. 1996)); *see United States v. Bosse,* 898 F.2d 113, 115 (9th Cir.1990) ("Special limitations apply when a government agent obtains entry by misrepresenting the scope, nature or purpose of a government investigation."). Accordingly, "[w]hen government agents seek an individual's cooperation with a government investigation by misrepresenting the nature of that investigation, this deception is appropriately considered as part of the totality of circumstances in determining whether consent was gained by duress or coercion." *Harrison,* 639 F.3d at 1278–79.

## II. Analysis

 This case is not a case where the police used an overwhelming show of force to gain consent to entry, but it is a case where trickery and unretracted lies literally opened the door to the police-a door that would have stayed closed by both Ms. Martin, a transient in the apartment who had explicitly asked the officers to leave when they lied about their status as "Tim from maintenance," and who opened the door only after they told her, "we're not leaving," a statement of intention they never retracted; and by Mr. Boyd, the actual regular occupant of the apartment, who expressed reservation about the officers' presence and who never unequivocally gave his consent to entry or search. Under these circumstances, and on this record, the Court finds that the government has not carried its burden of establishing by a preponderance of the evidence that consent to enter was "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion," *Canipe,* 569 F.3d at 602, whether the duress was induced by show or force, *see United States v. Thomas,* 430 F.3d 274, 277–78 (6th Cir.2005), or by guile, *Hardin,* 539 F.3d at 425. The totality of the circumstances establish that before Ms. Martin opened the door to the apartment and let the officers enter, the investigators lied about their identity, refused to leave the residence's doorstep, stated they would not leave, failed to inform an 18–year–old woman that she did not have to consent to their entry despite their previous statements, never referred to themselves as

police, and neglected their duty to clear up ambiguity.

At the outset of the interaction between the police and Ms. Martin, the police resorted to an allowed, but easily misused, investigatory tactic: a "knock and talk." No exigency existed on February 24, 2009, as the police had known about the anonymous tip for months, and thus the officers could have employed a different investigative method had they chosen to do so. The Sixth Circuit recognizes the "knock and talk" investigation as legitimate, as long as the encounter is consensual. *See Thomas*, 430 F.3d at 277. While not prohibited, this investigation technique is subject to abuse by law enforcement, as an officer's zeal to gain information can prey on citizens' belief in the honesty of the police. *See United States v. Claus*, 2010 WL 3522117, *3 (W.D.Pa.2010) ("The Court is not particularly enamored with the 'knock and talk' tactic, as it is susceptible to abuse by overzealous officers and may take advantage of the hospitality of citizens."); *State v. Ferrier*, 136 Wash.2d 103, 960 P.2d 927, 933 (1998) ("any knock and talk is inherently coercive to some degree"); *Hayes v. State*, 794 N.E.2d 492, 497 (Ind.App.2003) ("Knock and talk might more aptly be named 'knock and enter,' because it is usually the officer's goal not merely to talk but to conduct a warrantless search of the premises. While not per se unlawful, the knock and talk procedure 'pushes the envelope' and can easily be misused."). The knock and talk encounter between the officers in this case and Ms. Martin was made coercive by Investigator Millard's behavior after he knocked on the apartment door. *See United States v. Spotted Elk*, 548 F.3d 641, 655 (8th Cir. 2008) ("a police attempt to 'knock and talk' can become coercive if the police assert their authority, refuse to leave, or otherwise make the people inside feel like they cannot refuse to open up").

The interaction between the officers and the occupants of the apartment began with a lie. After Investigator Millard knocked twice, Ms. Martin asked who was at the door. Instead of telling the truth about his identity, Investigator Millard lied, telling whoever was on the other side of the door that he was "Tim from maintenance." A reasonable person observing "Tim from maintenance" through a window or peephole would not have any reason to dispute the identification, as "Tim from maintenance" and his partner were dressed in plainclothes, with no badges or weapons visible. The officers used this lie about their identity purposefully. By Investigator Millard's own admission, the false identification was designed to induce contact with the apartment's occupants. The officers' deceit had the exact manipulative effect Investigator Millard wanted, as Ms. Martin eventually opened the door.

Any lie by a police officer to a citizen about the officer's identity may raise suspicion, but the false identity in this case is especially troubling. Investigator Millard's statement that he was "Tim from maintenance" escalated the pressure on the occupants of the apartment in a way that other false identities would not. Investigator Millard, who testified that the false identity he uses is up to his own "creativeness," did not represent himself and Investigator Ghiringhelli as strangers, social guests, or door-to-door salespersons, none of whom have any right to enter a dwelling. The false identity used here, however, creates an entirely different expectation in the mind of a reasonable person. Landlords normally have the right to enter rental units for maintenance purposes, at least if they can do so without breach of the covenant of quiet enjoyment, or any express limits in a rental contract. Thus, a knock from "maintenance" carries more force than a knock by someone who does not have a lawful right to enter. *See*

*Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (voluntary consent must be more than "acquiescence to a claim of lawful authority"); *Hardin,* 539 F.3d at 425, n. 12 ("officers may invalidate an individual's consent through the use of certain ruses or trickery"); *Butler v. Compton,* 158 Fed. Appx. 108, 109, 111 (10th Cir.2005). In this case, "Tim from maintenance" had a presumptive contractual right to enter; the investigators did not. This particular lie about the police officers' identities—a false identity with whom a reasonable person would feel compelled to engage—undermines the voluntariness of Ms. Martin's consent.

Investigator Millard's lie about his identity is also problematic because it came in the context of a person who did not want to engage with whoever was knocking on the door. First, Investigator Millard knocked on the apartment door and did not receive any response. When he knocked a second time, a female voice asked, without opening the door, who was there. Investigator Millard then lied about his identity to keep the interaction going and to get the person on the other side of the door to open it. Upon learning it was "Tim from maintenance," the person did not open the door but instead asked him to come back later, as she was not dressed. "Any ordinary caller, under like circumstances, would understand" that the occupant of the apartment did not want to open the door. *Carter,* 378 F.3d at 588 (citing *Robbins v. MacKenzie,* 364 F.2d 45, 49 (1st Cir.1966) ("An ordinary person who knocks on the door and receives assent

may properly consider himself an invited guest …")); *see United States v. Moore,* 91 F.3d 96, 98 (10th Cir.1996) ("If the occupants do not admit the officers within a reasonable period of time, the officer may be deemed to be constructively refused admittance …"). It was clear to the officers that the person inside the apartment did not want to speak to them at that moment, much less invite them into the home.

The coercive effect of Investigator Millard's lie was made even more troubling by his statement, "we're not leaving."[2] Even if a reasonable person believed that she could refuse to open the door to "maintenance," "we're not leaving" strips the individual of that belief. Resistance appeared futile, because "Tim from maintenance"— someone who has a presumptive contractual right to enter the apartment—refused to leave and come back later. The problem is compounded if Ms. Martin, upon opening the door, understood that the police were in front of her, because the officers did not cure this statement. *See Worley,* 193 F.3d at 386; *United States v. Jerez,* 108 F.3d 684, 692 (7th Cir.1997) ("The officers' persistence destroyed any possibility that the occupants could return to sleep and ignore the officers."); *United States v. Winsor,* 846 F.2d 1569, 1573, n. 3 (9th Cir.1988) (*en banc*) ("[C]ompliance with a police 'demand' is not consent."). "We're not leaving" may have "convey[ed] a message that compliance with [Investigator Millard's] requests [was] required." *Florida v. Bostick,* 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). The

**2.** Investigator Millard testified during cross examination that he made this statement, but he immediately backed away from this testimony. After observing him on the stand and hearing his testimony, the Court finds as a factual matter that Investigator Millard did tell Ms. Martin "we're not leaving." The statement, which Investigator Millard testified

to without any particular prompting, was one of the few spontaneous utterances he made during his testimony. Much of what he said on the stand tracked his investigation report, but this particular statement appeared to have been made from the officer's actual recollection of what happened.

police, whether in uniform or in plain-clothes, whether identifying themselves honestly or as maintenance personnel, may not use overbearing tactics to force a citizen to consent to their demand. *See Thomas,* 430 F.3d at 277.

When Ms. Martin did open the door, it was clear to Investigator Millard that she was young, and in fact the record reflects that she was 18 years old. *See United States v. Jones,* 846 F.2d 358, 360 (6th Cir.1988) (citing *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041) ("Among the relevant circumstances to be scrutinized are the defendant's youth, lack of education or low intelligence . . ."). Moreover, it was also clear that she was not ready to meet people. She had been undressed, she told the officers earlier, and when she did open the door she was in pajamas or a robe. *See Schneckloth,* 412 U.S. at 229, 93 S.Ct. 2041 (a court must take account of "the possibly vulnerable subjective state of the person who consents"). In this vulnerable position, Ms. Martin faced two men on the doorstep. Both were dressed for the February Michigan weather in coats, and both were armed.

Compounding all these circumstances, nothing the officers said or did purged the taint of the earlier lie about their identities and the "we're not leaving" statement. First, the investigators were not "instantly recognizable as policemen," since they were both dressed in plainclothes. *Carter,* 378 F.3d at 588. They never said they were "police," and the testimony did not reveal an instance where either officer clearly identified himself as a police officer. The investigators never retracted their "maintenance" story. Instead, they flashed their "public safety" ID—located at waist-level—for eight seconds, and simply said they were "investigating," which did not shed the taint of the earlier lie about being from maintenance. They never retracted the statement, "we're not

leaving," even though "a police attempt to 'knock and talk' can become coercive if the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up." *Spotted Elk,* 548 F.3d at 655. The officers had earlier "refused to take 'no' for an answer," *Jerez,* 108 F.3d at 692, and they did not say or do anything after identifying themselves as public safety officers that would indicate the contrary to Ms. Martin.

The officers could have ameliorated the failure to purge the false identification and the refusal to leave by informing Ms. Martin of her right to refuse to consent to their entry, but they chose not to do so, despite sometimes offering written consent waivers to citizens in similar situations. "Although the Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to search, such knowledge was highly relevant to the determination that there had been consent." *United States v. Mendenhall,* 446 U.S. 544, 558–59, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (citing *Schneckloth,* 412 U.S. at 234, 93 S.Ct. 2041 (internal citation marks omitted)); *see Lucas,* 640 F.3d at 175 (evidence established that defendant had knowledge of his right to refuse consent and that he "contemplated exercising that right"). The evidence in the record before the Court indicates that unlike the defendant in *Lucas,* Ms. Martin did not have knowledge of her right to refuse consent. *See Carter,* 378 F.3d at 588 ("Nothing in the record indicates that [the defendant] was unaware of his well-known right to refuse entry."). Her previous request that "Tim from maintenance" come back later was flatly refused, and any further resistance appeared futile. *See Worley,* 193 F.3d at 386.

Once inside the apartment, Investigator Millard lied again to Ms. Martin, telling her that the officers were there to investi-

gate heroin. He repeated this lie when Mr. Boyd came out of the bedroom. At no time during the encounter did the officers ever say that they were police. At no time during the encounter did the officers ever disclose the true nature of their interest: namely, crack cocaine sales. The incongruous situation finds two citizens in the residence, neither charged with any crime and neither subject to search based on probable cause, obligated by law to speak truthfully to the officers, yet confronted by the officers themselves with a series of unretracted lies told by the officers with the purpose, intent and effect of gaining entry to a home they had no right to enter. That turns the Fourth Amendment protection of home privacy on its head.

The officers never got unequivocal consent from either Nichol or the actual regular occupant, Mr. Boyd, to search the apartment. There is no evidence in the record that Ms. Martin consented in any way to a search of the apartment. In fact, Ms. Martin was not a regular occupant of the apartment and her authority to consent, either to entry or to a search, is left in doubt. *See United States v. Purcell,* 526 F.3d 953, 963 (6th Cir.2008) ("apparent authority cannot exist if there is ambiguity as to the asserted authority and the searching officers do not take steps to resolve the ambiguity"). Upon learning from Mr. Boyd that Nichol was not an occupant of the apartment, neither officer asked him whether he consented to their entry. Moreover, Mr. Boyd twice expressed discomfort with the officers' desire to search the apartment. Before Investigator Millard even asked to search the apartment, Mr. Boyd stated that he was not sure he wanted the officers to look around. He said it again after Investigator Millard directly asked him if he could search. Neither officer informed Mr. Boyd that he had the right to refuse to consent to a search, and Mr. Boyd did not view or sign any written consent forms, even though the officers use such forms during other searches. Instead, they accepted "yeah, do what you have to do" as unequivocal consent from Mr. Boyd, despite his earlier statements and lack of knowledge about his rights.

The police may not "deploy overbearing tactics that essentially force" an individual to consent. *Thomas,* 430 F.3d at 277. Although some police tactics involve physical force, subtle coercion may render consent involuntary. *Schneckloth,* 412 U.S. at 229, 93 S.Ct. 2041. The officers in this case used subtle, and not so subtle, coercion—lies about identity, refusal to leave, failure to purge the taint of their comments, ambiguous identification as police officers, failure to inform Ms. Martin of her rights—to gain Ms. Martin's consent to enter the apartment. In combination these factors render her consent involuntary, because a reasonable person in Ms. Martin's position would not feel free to refuse to open the door, and then refuse entry upon learning the true identity of who was there. The totality of the circumstances in this case adds up to improper coercion.

■■■■ The Court's ruling does not affect the long-standing principle that government agents may misrepresent and conceal their identity as part of a bona fide undercover operation to gain access to a home. *See Lewis v. United States,* 385 U.S. 206, 209, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966) ("in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents"); *United States v. Baldwin,* 621 F.2d 251, 252–53 (6th Cir.1980) ("an agent may legitimately gain entrance into a house by misrepresenting his identity"). Undercover police operations, an important investigative tool, do not violate the Fourth Amendment when the officers involved play out their role, whatever that

role may be. Accordingly, "[a] government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises *for the very purposes contemplated by the occupant.*" *Lewis,* 385 U.S. at 211, 87 S.Ct. 424 (emphasis added). When a government agent misrepresents his or her identity and carries that identity through, whether it be as a chauffeur, *Baldwin,* 621 F.2d at 252, or as a real estate agent, *United States v. Lord,* 230 Fed.Appx. 511, 513–14 (6th Cir.2007), a subsequent search is not invalidated by the misrepresentation when the agent plays out the role, because "the Fourth Amendment ... does not protect wrongdoers from misplaced confidence in their associates." *Baldwin,* 621 F.2d at 252. However, when an officer mixes roles, first pretending to be one identity and then revealing his role as a police officer (or "public safety" officer), the officer exceeds the consent given by the occupant. *See United States v. Ressler,* 536 F.2d 208, 211 (7th Cir.1976) ("When an agent assumes a particular pose in order to gain entry into certain premises and then obtains information by engaging in activity not generally expected of one assuming that pose, that information is illegally obtained."). In those situations, there must be clear division and cure between the roles. Here, Investigator Millard testified that he had no intention of carrying through his lie about being "Tim from maintenance" to the end of the interaction, yet he did not clearly identify himself as a police officer and not "Tim from maintenance," and he did not cure the lies he told to get Ms. Martin to open the door. Rather than engaging in an undercover operation that they saw through to the end of the encounter, the officers here used deception and threats to gain Ms. Martin's consent, a consent that was not "voluntary, unequivocal, specific, intelligently given, and uncontaminated by

duress or coercion." *Canipe,* 569 F.3d at 602.

 Everything that happened between Mr. Boyd and the police, including the search and Mr. Boyd's alleged incriminating statements, was tainted by the illegal entry into the apartment. The Court must determine "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *United States v. Pearce,* 531 F.3d 374, 381 (6th Cir.2008) (quoting *Hudson v. Michigan,* 547 U.S. 586, 592, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006)). "Dissipation of the taint resulting from an [illegality] ordinarily involves showing that there was some significant intervening time, space or event." *United States v. Shaw,* 464 F.3d 615, 625 (6th Cir.2006) (alterations in original) (quoting *United States v. Buchanan,* 904 F.2d 349, 356 (6th Cir.1990)). Here, the officers did nothing to purge the primary taint of the illegal entry in gaining the evidence they obtained. Upon entering, the officers never said they were "police," they did not ask Mr. Boyd if he consented to their being in the apartment, they lied about the purposes of their investigation, and they never obtained written consents from either Ms. Martin or Mr. Boyd to enter or search the apartment. They did not have probable cause for a warrant to search the apartment or arrest the defendant, and without the entry into the home, the officers would not have gained access to the evidence eventually recovered. The crack cocaine, the firearm, and Mr. Boyd's statement came at the exploitation of the unconstitutional entry, and the officers did not purge the ensuing taint.

## Conclusion

Mr. Boyd's motion to suppress (docket # 13) is **GRANTED.**