NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0244n.06
No. 21-3737

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jun 16, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| v. | ) ) | THE SOUTHERN DISTRICT OF OHIO |
| DEON SANDERS, | ) ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before:  MOORE, STRANCH, and LARSEN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  Deon Sanders pleaded guilty to possessing a firearm as a prohibited person.  Before entering his plea, he moved to suppress the evidence underlying the charge.  Sanders argued that his girlfriend, Reja Faulkner, did not voluntarily consent to police officers' search of her apartment, where the officers found three firearms.  At a suppression hearing, Faulkner testified that the officers had coerced her into consenting.  The officer who obtained consent testified that she did not threaten Faulkner and that Faulkner consented voluntarily.  The district court denied Sanders's suppression motion, finding the officer's testimony more credible.  Deferring to the district court's credibility finding, we **AFFIRM** the district court's judgment.

### I.  BACKGROUND

On the night of November 14, 2017, Cincinnati Police Department (CPD) Officer Kerri Maloney and Lieutenant David Schofield responded to a report of shots fired near Ringgold Street

in Cincinnati. R. 24 (Hr'g Tr. at 34–35) (Page ID #87–88). Arriving at the scene, Maloney and Schofield observed a woman sitting in the passenger's side of a car parked in the alleyway off Ringgold Street. *Id.* at 35–36 (Page ID #88–89). The woman left the car, briefly entered an apartment located in the alley, and returned outside. *Id.* Meanwhile, Schofield observed rifle shell casings on the ground between the corner of the alley and Ringgold. *Id.* at 79 (Page ID #132).

Around the same time, six additional police officers arrived to assist. *Id.* at 37–38, 55 (Page ID #90–91, 108). Unlike Maloney and Schofield, three of these officers, Herrmann, Horner, and Ventre, were wearing body cameras, which recorded a substantial portion of the events of that night. *Id.* at 36–37 (Page ID #89–90). Maloney and Schofield testified that their job duties and CPD policy at the time did not require them to wear body cameras. *Id.* at 36–37, 76–77 (Page ID #89–90, 129–30).

Maloney and Schofield asked to speak to the woman, who identified herself as Reja Faulkner. *Id.* at 35–36 (Page ID #88–89). Maloney asked Faulkner if she owned firearms, and Faulkner explained that she held a concealed carry permit and had a rifle and two other firearms in her apartment. *Id.* at 21, 45 (Page ID #74, 98); Ventre 1:38–1:45; Horner 19:39–19:51.[1] During this conversation, Faulkner told the officers that she "kn[ew] the law." R. 24 (Hr'g Tr. at 21–22, 40) (Page ID #74–75, 93). Faulkner also told the officers that she had been sitting in her car with her boyfriend, Defendant Sanders, when she heard gunshots. Herrmann 11:34–12:01. Sanders had then retreated to the apartment. *Id.*

---

[1]Citations to the body camera footage in this opinion include the name of the officer wearing the body camera followed by the time stamp of the portions of the video showing the relevant events.

Having seen the rifle shell casings in the alleyway, the officers were interested in Faulkner's disclosure that she owned a rifle. Horner 19:40–19:54. Maloney pulled Faulkner aside, seeking consent to search Faulkner's apartment. Herrmann 12:00–12:30.

The parties dispute the contents of the conversation between Faulkner and Maloney, which the body camera footage did not record. Maloney testified that she led Faulkner away from the other officers, both for tactical reasons and so that Faulkner would feel less intimidated. R. 24 (Hr'g Tr. at 57–58, 60) (Page ID #110–11, 113). According to Maloney's testimony, Maloney asked Faulkner if Maloney could enter the apartment to retrieve the firearms, and Faulkner gave permission. *Id.* at 40–41(Page ID #93–94). Faulkner, however, testified that she refused Maloney permission to enter. *Id.* at 25 (Page ID #78).

Maloney then walked with Faulkner back to Schofield, now in view of the officers' body cameras. The footage appears to show Maloney explaining to Schofield "that Ms. Faulkner had a rifle and two additional firearms in the apartment, that Ms. Faulkner was going to try to call [Sanders] out of the apartment, and that Ms. Faulkner had given the officers permission to go into the apartment once [Sanders] had exited." *United States v. Sanders*, No. 1:18-cr-031, 2019 WL 3459352, at *2 (S.D. Ohio July 31, 2019) (citing Herrmann 13:22–13:45; Ventre 11:36–11:53).[2] Faulkner was standing right next to Maloney during this explanation but did not object to it or correct Maloney. Ventre 11:43–11:53.

The officers and Faulkner then walked to the door of the Ringgold apartment. *Id.* at 11:54-12:05. Faulkner and the officers called for Sanders to come out, but Sanders did not, at first,

---

[2]Although Maloney's exact words are not clearly discernable from the body camera footage, Sanders does not dispute the district court's interpretation of Maloney's statements. From an independent review of the footage, moreover, we find the district court's characterization of Maloney's summary to Schofield reasonable.

respond. *Id.* at 12:08–12:25. Faulkner began to express impatience and discomfort. *Id.* at 12:25-12:45. As Faulkner took a step toward the door, Schofield briefly grabbed her jacket and pulled her away from the doorframe. *Id.* at 12:28–12:31. Schofield later testified that he was trying to prevent Faulkner from entering the apartment for her safety and that he let go of Faulkner as soon as she "stopped her forward movement." R. 24 (Hr'g Tr. at 84) (Page ID #137).

Faulkner continued to call to Sanders, shouting that officers were "pulling on [her] hoodie" and "choking" her, and that she felt uncomfortable and nervous. Ventre 12:27–12:41. Schofield explained that he was trying to keep her safe, and Faulkner stated that she just wanted Sanders to come down. *Id.* Eventually, Sanders came out of the apartment, and officers placed him in handcuffs. *Id.* at 12:50–13:00.

After Faulkner's nine-year-old son came out from the apartment, officers prepared to enter. *Id.* at 14:07–14:30. Faulkner asked if the officers were "allowed to" enter her apartment without her, especially when her two-year-old child was inside sleeping. *Id.* at 17:25–17:38. Maloney explained that Faulkner had already consented to the officers entering the apartment, and Faulkner exclaimed that she never gave consent. *Id.* at 17:31–17:45. If the officers "had just ask[ed]," for consent, she explained, she would have been able to say "yes or no." *Id.* at 17:40–18:05. She further explained that her daughter was inside sleeping, and that she would like to come inside with the officers. *Id.* at 18:04–18:10. In light of Faulkner's hesitation, Schofield asked Maloney to speak with Faulkner again. Herrmann 21:31–21:35.

Meanwhile, Herrmann had run Sanders's criminal history and told Schofield that Sanders had prior felony convictions for drug trafficking. *Id.* at 21:19–21:31. Schofield noted that Sanders's convictions and the firearms inside the apartment gave the officers probable cause to obtain a warrant, but he did not want to "take up [Herrmann's] entire night." *Id.* at 21:48–21:55;

4

22:07–22:20.  Because he believed that Faulkner had previously consented, Schofield hoped that Maloney would be able to obtain consent again from Faulkner.  *Id.* at 21:49–22:00

Maloney pulled Faulkner aside to speak with her a second time, and this conversation was also not captured on body camera.  *Id.* at 21:38–21:42.  Again, the parties dispute the contents of the conversation.  Maloney testified that she explained to Faulkner that she could not accompany the officers to search her apartment for safety reasons, but that the officers would not disturb Faulkner's daughter.  R. 24 (Hr'g Tr. at 42, 44, 70) (Page ID #95, 97, 123).  Maloney understood Faulkner's daughter to be Faulkner's primary concern.  *Id.* at 44 (Page ID #97).  Maloney also told Faulkner that Faulkner had the option to refuse consent, but in that case, the officers could seek a warrant to search for the firearms.  *Id.*  According to Maloney, Faulkner told Maloney that the officers could enter the apartment to search for and seize the firearms and gave Maloney the locations of the firearms.  *Id.* at 45–47, 70 (Page ID #98–100, 123).

Faulkner disputed Maloney's testimony.  She testified that Maloney threatened to take Faulkner downtown and that someone would have to take custody of her kids if Faulkner refused to consent.  *Id.* at 11–12, 24 (Page ID #64–65, 77).  Faulkner further testified that, feeling pressured, she allowed the officers to search for the rifle, but not the other firearms.  *Id.* at 11–13 (Page ID #64–66).  Maloney denied threatening to take custody of Faulkner's children.  *Id.* at 48 (Page ID #101).

During this second conversation between Maloney and Faulkner, Herrmann, with his body camera still on, walked by with Sanders.  Herrmann 22:50–23:05.  Faulkner asked Sanders where the rifle was, and Sanders told her he thought it was in the bedroom.  *Id.* at 22:57–23:05.  Horner, who was also wearing his body camera, then approached Schofield, who was standing a few feet away from Maloney and Faulkner.  Horner 00:54–1:00.  Although Horner's body camera does not

capture the clearest audio, Maloney looked up toward Horner and Schofield and appeared to ask Faulkner, "so you're going to allow us to go in and [inaudible] the firearms?" *Id.* at 1:03–1:10. Faulkner did not protest, and the officers began walking back toward the Ringgold apartment. *Id.* at 1:10–1:16. Schofield testified that he was "absolutely" certain that Faulkner had consented to the search. R. 24 (Hr'g Tr. at 88) (Page ID #141).

The officers then entered the apartment and began the search. Ventre 24:40–25:00. Maloney relayed to Schofield that Faulkner had told her that she thought the firearms were near the dresser, refrigerator, and under the couch. *Id.* at 27:33–38. Schofield immediately found a handgun on top of the refrigerator. *Id.* at 27:38–27:40; R. 24 (Hr'g Tr. at 85) (Page ID #138). Schofield then found the rifle and another handgun in Faulkner's bedroom closet and seized all three firearms. R. 24 (Hr'g Tr. at 85–86) (Page ID #138–39).

After the officers concluded the search, Ventre's body camera captured the officers discussing next steps. Ventre 34:10–35:40. The officers agreed that they had obtained verbal consent on body camera but discussed obtaining consent in writing in case the body camera did not capture consent very clearly. *Id.* at 34:55–35:36. Pursuant to that conversation, Schofield asked Maloney to obtain a signed consent form from Faulkner to "tighten up the consent." *Id.* at 35:18–35:36. Without objection, Faulkner signed the consent form, which included an inventory of the items seized: all three firearms and ammunition. R. 24 (Hr'g Tr. at 47–48) (Page ID #100–01); R. 55 (Consent Form) (Page ID #375).

Based on the seized evidence, the government charged Sanders with possession of a firearm by a person with a felony conviction, in violation of 18 U.S.C. § 922(g)(1). R. 7 (Indictment) (Page ID #12). Sanders moved to suppress the firearms and ammunition, arguing that Faulkner did not voluntarily consent to the search. R. 18 (Mem. in Supp. of Mot. to Suppress

at 4–5) (Page ID #32–33). After a hearing, Sanders renewed his suppression motion, preserving his argument that Faulkner did not give consent voluntarily, and further arguing that the scope of Faulkner's consent was limited to the rifle. R. 26 (Post-Hr'g Br. in Supp. of Mot. to Suppress at 1–6) (Page ID #195–200).

The district court denied Sanders's motion. *Sanders*, 2019 WL 3459352, at *10. The district court first found that Sanders had standing to contest the search because he was a frequent overnight guest at Faulkner's apartment, had a key to the apartment, and had permission to come and go.[3] *Id*. at *5. Weighing the evidence and the testimony, the district court further found that Faulkner had consented voluntarily to the search and that the scope of Faulkner's consent included a search for all three firearms.[4] *Id.* at *8. Finally, the court found that, even if Faulkner had consented only to the search for the rifle, the officers properly seized the other firearms under the plain-view doctrine. *Id.* at *9.

Sanders pleaded guilty, reserving his right to appeal the district court's denial of his suppression motion. R. 31 (Plea Agreement ¶ 2, 10) (Page ID #242, 244–45). The district court sentenced Sanders to seventy months in prison and three years of supervised release. R. 42 (Judgment at 2–3) (Page ID #336–37). Sanders timely appealed.

---

[3]The government does not challenge this finding on appeal. Because Fourth Amendment standing does not implicate our duty to assure ourselves of our jurisdiction, we will not disturb the district court's finding that Sanders had standing to challenge the search of Faulkner's apartment. *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).

[4]The district court also found that the officers were allowed to rely on Faulkner's consent to search her apartment, even though Sanders was living there at least part time. *Sanders*, 2019 WL 3459352, at *10. Faulkner was the apparent resident of the apartment, and Sanders did not object when Faulkner was talking to officers about their potentially entering the apartment in Sanders's presence. *Id*. Sanders does not challenge this finding on appeal.

## II. ANALYSIS

The Fourth Amendment protects the people from "unreasonable searches and seizures." U.S. Const. amend. IV. Searches conducted without a warrant or probable cause "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). The "specifically established" exception at issue here is consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Sanders argues that the district court erroneously denied his motion to suppress the evidence that the police seized from Faulkner's apartment because Faulkner did not consent voluntarily to a search for all three firearms.

"When reviewing [a] district court's ruling on a motion to suppress, we review findings of fact for clear error and legal conclusions de novo." *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020) (quoting *United States v. Jackson*, 682 F.3d 448, 452 (6th Cir. 2012)). Specifically, we review for clear error "the finding that a party gave voluntary consent." *United States v. Sheckles*, 996 F.3d 330, 346 (6th Cir. 2021). In reviewing factual findings, we consider the evidence in the light most favorable to the government. *Lott*, 954 F.3d at 922.

## A. Voluntariness of Consent

Sanders first argues that Faulkner's consent to search the apartment was involuntary. Only consent that an individual gives voluntarily and freely obviates the need for a warrant. *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008). "Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" *Id.* (quoting *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977)). The government bears the burden to prove by a preponderance of evidence that consent was voluntarily given, through "clear and positive testimony." *United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020) (quoting *United States*

*v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009)).  In evaluating whether the government satisfied this burden, we consider the "totality of the circumstances," which include "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police."  *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quoting *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996), *abrogated on other grounds by Muscarello v. United States*, 524 U.S. 125 (1998)).  None of these factors is dispositive.  *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011).

The district court did not clearly err in applying the first four factors.  None of Faulkner's personal characteristics rendered her susceptible to coercion.  Faulkner, an adult in her late 20s when the search was conducted, *see* R. 24 (Hr'g Tr. at 5) (Page ID #58), responded cogently and coherently when officers asked her questions.  Herrmann 11:33–12:02.  Faulkner also understood her rights, namely, that she could question the officers and that she could refuse consent.  She asked the officers if they were "allowed" to go into her apartment while her daughter was there and told them she could say "yes or no" if they "just ask[ed]" her for her consent.  Ventre 17:25–18:10.  Considering Faulkner's comfort with expressing her initial hesitation, the district court reasonably determined that Faulkner understood her right to refuse consent.  *See Lucas*, 640 F.3d at 175.  Indeed, Faulkner told the officers when they began their investigation that she "kn[ew] the law."  R. 24 (Hr'g Tr. at 21–22) (Page ID #74–75).  Finally, the length of the detention was brief: the district court correctly noted that the entire pre-search interaction lasted less than thirty minutes.  Ventre 00:00–22:35.

Sanders does not contest these findings.  Instead, he argues that the district court clearly erred in finding that police did not use coercive tactics to obtain Faulkner's consent.  He contends

that the police held Faulkner by her jacket, told Faulkner that the officers would detain her all night, and threatened to take her downtown and take her children away. According to Sanders, Faulkner consented "under duress" because she felt "powerless to refuse" the officers' requests. Appellant Br. at 13.

The district court interpreted the facts differently.[5] As for the physical restraint, it found that the police held on to Faulkner's hoodie to prevent her from re-entering her apartment for safety reasons. *Sanders*, 2019 WL 3459352, at *7. The district court reasonably determined that this brief physical contact was not coercive. Although Faulkner expressed agitation when Schofield pulled her jacket, Faulkner also clarified the source of her discomfort: she just wanted Sanders to come out. Ventre 12:27–12:41. Schofield, moreover, assured her that he was looking out for her safety. *Id.* From this cursory interaction, we do not see the indicia of coercion that we have found when, for example, a frightened, visibly shaking person whom police had randomly frisked moments prior did not freely consent. *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011). By the time that Maloney obtained consent from Faulkner a second time, over ten minutes had passed after this encounter, Sanders had left the apartment, and Faulkner appeared calm. *Compare* Ventre 12:27–12:41, *with id.* at 22:20, *and* Horner 1:00–2:20. Because the effect of this minimal use of force appeared to have dissipated when Faulkner spoke to Maloney, the district court reasonably found that the brief safety restraint did not affect Faulkner's capacity to consent. *See Sheckles*, 996 F.3d at 347.

---

[5]The district court did not address Sanders's claim that officers told Faulkner that "they would stay here all night." Appellant Br. at 12. Sanders does not cite to the record to support this claim in his brief, however. Nor have we found anything in the record to support it. The only arguably similar statement is Schofield's comment to Herrmann, made outside of Sanders's presence, that Schofield did not want to take up Herrmann's "entire night" by seeking a warrant. Herrmann 22:07–22:20. We find reasonable the district court's decision to disregard this statement as evidence of coercion.

Sanders's main claim of coercion—that Maloney threatened to take Faulkner downtown and take custody of Faulkner's children—turns on a credibility determination that the district court resolved in the government's favor. We defer especially to a district court's credibility determinations, which bind us unless there is a "clear basis" in the record for rejecting them. *United States v. Hudson*, 405 F.3d 425, 442 (6th Cir. 2005); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."). Maloney denied that she told Faulkner that she would take Faulkner downtown or take Faulkner's children. R. 24 (Hr'g Tr. at 48) (Page ID #101). The district court found Maloney's testimony more credible than Faulkner's, noting that the recorded portions of conversations did not reveal that the officers threatened Faulkner or that Faulkner appeared threatened. *Sanders*, 2019 WL 3459352, at *7. The district court further remarked that the evidence contradicted Faulkner's denial, after Maloney's first conversation, that she consented to the search at all. *Id.*

Sanders first argues that we should reject the district court's finding because Officer Maloney failed to wear a body camera while asking for Faulkner's consent, violating CPD policy. This failure, according to Sanders, casts doubt upon Maloney's credibility, presumably because it suggests that Maloney purposefully turned off her camera so that she could obtain Faulkner's consent through coercion. By Sanders's account, Faulkner suddenly consented only after her second unrecorded conversation with Maloney, and only coercion could explain Faulkner's about-face.

Maloney's failure to record her conversations with Faulkner provides us no "clear basis" to disturb the district court's credibility finding. *Hudson*, 405 F.3d at 442. First, Schofield and Maloney testified that the department policy allowed an officer to obtain verbal consent off-camera if a supervisor was present. R. 24 (Hr'g Tr. at 36–37, 76–77) (Page ID #89–90, 129–30). Sanders did not object to this testimony or provide the district court with the allegedly correct policy to which he now refers. We generally do not consider facts that were not before the district court. *United States v. Bonds*, 12 F.3d 540, 552–53 (6th Cir. 1993). In any event, even if the officers failed to follow department policy, that failure does not, by itself, provide a clear reason to undermine the district court's credibility finding.

To the contrary, the district court recognized that the body camera did not record Maloney's and Faulkner's conversations, but nonetheless found that the "portions that were captured do not evidence any . . . threats." *Sanders*, 2019 WL 3459352, at *7. We agree with the district court that Faulkner's demeanor on camera did not indicate that she felt threatened, even after her second conversation with Maloney.

The district court also reasonably rejected Sanders's premise that Faulkner suddenly consented only after her second unrecorded conversation with Maloney. Although admittedly no paradigm of clarity, the body camera footage shows that after Maloney's first conversation with Faulkner, Maloney told Schofield in Faulkner's presence that Faulkner had given permission to search her apartment. Herrmann 13:22–13:45; Ventre 11:36–11:53. Faulkner did not protest. Ventre 11:43–11:53. We note that Faulkner clearly expressed to Maloney that she did not consent to the officers' entry after that first conversation, Ventre 17:35–17:45, and that Faulkner had every right to revoke her consent. *Cf. Lucas*, 640 F.3d at 176–77. The evidence that Faulkner consented after the first conversation, however, contradicts Sanders's assertion that Faulkner "finally

12

relented" only after the second, allegedly coercive, unrecorded conversation with Maloney. Appellant Br. at 12. The district court thus logically ascribed little importance to the fact that Maloney's and Faulkner's conversations were not recorded.

To be sure, Maloney did testify that she explained to Faulkner in their second conversation that the officers could obtain a warrant to search Faulkner's apartment without her consent. R. 24 (Hr'g Tr. at 44) (Page ID #97). As the district court explained, however, when probable cause exists, an officer's raising the prospect of a warrant is not coercive unless the officer's threat is baseless or pretextual. *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998). Here, the district court reasonably found that the officers had probable cause to obtain a warrant. *Sanders*, 2019 WL 3459352, at *7. Responding to reports of shots fired, police found rifle shell casings in an alleyway, and Faulkner, whom the officers found near the alleyway, admitted that she owned a rifle. R. 24 (Hr'g Tr. at 21, 45) (Page ID #74, 98); Ventre 1:38–1:45; Horner 19:39–19:51. Officers also knew that Sanders was convicted of a felony, that he was living in Faulkner's apartment, and that multiple firearms were in the apartment. Herrmann 21:20–22:20. Because officers had probable cause to support violations of the prohibition on discharging firearms in a public road, Ohio Rev. Code § 2923.162(A)(1)(3), and the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1), they could have obtained a warrant to search Faulkner's apartment. The district court reasonably found that officers did not coerce Faulkner by relaying that information.

Finally, Sanders argues that Schofield's directions to Maloney to "tighten up consent" by giving Faulkner a consent form demonstrates that Faulkner's consent was coerced. Appellant Br. at 13. The body camera footage shows, however, that the officers agreed that the consent form was merely a precaution in case the body camera footage did not capture Faulkner's prior verbal consent. Ventre 34:55–35:36. Viewed in context, Schofield's statement confirms his testimony

13

that he was attempting to "make sure [the officers'] documentation [was] clear." R. 24 (Hr'g Tr. at 88) (Page ID #141).

Weighing the evidence, the district court observed no evidence of threatening conduct and found that Faulkner voluntarily consented. After considering the totality of the circumstances, we find no clear error in the district court's determination.

## B. Scope of Consent

Sanders next argues that Faulkner's consent was limited to searching for the rifle rather than the other two firearms, and that the officers exceeded the scope of that consent. A person giving consent to a warrantless search may limit the scope of the consent, and thus the permissible scope of the search. *United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004). We determine the scope of the consent from an objective perspective and ask, "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Generally, the object for which a person permits the police to search defines the search's scope. *Id.*

The district court did not err in finding that Faulkner gave broad consent to search and that a reasonable officer would interpret the scope of Faulkner's consent to include a search for the firearms. The scope of Faulkner's consent again rests on a credibility determination. Maloney testified that Faulkner gave the officers permission to retrieve the firearms and told her that they were in her apartment. R. 24 (Hr'g Tr. at 40–41, 47) (Page ID #93–94, 100). Faulkner denies that this occurred. *Id.* at 12–13 (Page ID #65–66). The district court again found Maloney's testimony more credible. *Sanders*, 2019 WL 3459352, at *8.

Evidence in the record supports the district court's credibility determination, and Sanders has not provided us with a clear basis to rebut it. Although Sanders correctly points out that the

exact wording of the question is inaudible, the district court reasonably found Maloney's on-camera question, "so you're going to allow us to go in and [inaudible] the firearms," and Faulkner's apparent agreement to corroborate Maloney's testimony. Horner 1:03–1:15. The audio clearly establishes that Maloney asked Faulkner about "firearms" in the plural form. *Id.* Further supporting Maloney's testimony, the body camera footage shows that Maloney told Schofield where Faulkner thought the firearms were located. Ventre 27:33–40. Without objection, Faulkner also signed the consent to search form, which included all three firearms in an inventory list, adding more weight to Maloney's side of the story. R. 24 (Hr'g Tr. at 47–48) (Page ID #100–01); R. 55 (Consent Form) (Page ID #375).

The only evidence Sanders offers to support Faulkner's version of events is Maloney's reports of the incident, which describe Faulkner's consent. The reports refer only to a "firearm" in the singular, stating that "[o]fficers asked Faulkner for consent to go into the apartment and retrieve the firearm, and she agreed to let the officers go in." *Sanders*, 2019 WL 3459352, at *8 (emphasis omitted); *see also* R. 24 (Hr'g Tr. at 64–65) (Page ID #117–18). The district court considered this evidence and found that the reports reflected the officers' primary objective—to retrieve the rifle as the source of shots fired—and did not focus on the scope of Faulkner's consent. *Sanders*, 2019 WL 3459352, at *8. In light of the other evidence of Faulkner's consenting to a search for all the firearms, the district court's interpretation of the evidence was not clear error.

Maloney testified that Faulkner gave the officers consent to retrieve all three of the firearms. If true, any reasonable officer would interpret the scope of the consent to include a search beyond the rifle. *See Jimeno*, 500 U.S. at 251. The district court found Maloney's testimony credible, and, finding no clear basis in the record to interpret it otherwise, we defer to that finding.

### III.  CONCLUSION

The district court did not err in finding that Faulkner consented to the search of her apartment for all three firearms.  Because we uphold the district court's decision on that ground, we need not address the district court's application of the plain-view doctrine to this case.  Accordingly, we **AFFIRM** the district court's denial of the motion to suppress.